[No. S053228. July 15, 2010.]

THE PEOPLE, Plaintiff and Respondent, v.
ANDRE STEPHEN ALEXANDER, Defendant and Appellant.

852

## Counsel

Michael J. Hersek, State Public Defender, under appointment by the Supreme Court, Susan Ten Kwan and Joseph Chabot, Deputy State Public Defenders; and Thomas Kallay, under appointment by the Supreme Court, for Defendant and Appellant.

Bill Lockyer and Edmund G. Brown, Jr., Attorneys General, Robert R. Anderson and Dane R. Gillette, Chief Assistant Attorneys General, Pamela C. Hamanaka, Assistant Attorney General, Sharlene A. Honnaka, Richard T. Breen, Keith H. Borjon, John R. Gorey and Stacy S. Schwartz, Deputy Attorneys General, for Plaintiff and Respondent.

## Opinion

**CHIN, J.**—On June 4, 1980, Julie Cross, an agent of the United States Secret Service, was murdered in the line of duty. Over a decade later, defendant Andre Stephen Alexander was charged with Cross's murder. In 1996, a jury convicted him of first degree murder (Pen. Code, § 187),[1] and found true allegations that he personally used a firearm and that a principal was armed with a firearm (§§ 12022.5, subd. (a), 12022, subd. (a)). The jury also found true special circumstance allegations that defendant previously had been convicted of murder (§ 190.2, subd. (a)(2)) and that the murder of Cross had been committed in the course of a robbery (§ 190.2, subd. (a)(17)). At the penalty phase of the trial, the jury returned a verdict of death. The trial court denied a motion for a new trial and the automatic motion to modify the penalty verdict (§ 190.4, subd. (e)), and it imposed the death sentence. Appeal to this court is automatic. (§ 1239, subd. (b).) We affirm the judgment.

[1] All further statutory references are to the Penal Code unless otherwise indicated.

## I. FACTS

### A. Guilt Phase

#### 1. Prosecution Evidence

##### a. Commission of the Murder

On the evening of Wednesday, June 4, 1980, Secret Service Agents Julie Cross and Lloyd Bulman were part of a team of agents planning to serve a search warrant on a suspected counterfeiter's residence. The two were partners whose role was to prevent the suspect's escape should he try to flee when the warrant was served. They were seated in an unmarked car near the corner of Belford Avenue and Interceptor Street near the Los Angeles International Airport; Bulman was in the driver's seat, and Cross was in the front passenger's seat. Both were dressed in civilian clothes.

The agents' vehicle contained a police radio and a 12-gauge shotgun with the standard Secret Service modifications of a shortened barrel, a pistol grip, and a folding stock. A guard attached to the barrel inhibited a person from placing a hand in front of the muzzle when firing the gun. This guard was unique to shotguns the Secret Service used because it was permanently, as opposed to temporarily, attached. On the night of the murder, the shotgun was loaded with four rounds: the first and third were slugs; the second and fourth were buckshot.

Bulman testified that, at some point before it became dark, a large, brown, two-door car with a lighter-colored roof and rust spots on the body slowly drove past the agents. The two African-American men in the car looked at the agents as they drove by. The driver was neatly groomed and had a mustache. The passenger wore a stocking cap and also had a mustache. Several minutes later, the same car with the same occupants again slowly drove by, this time parking a short distance away. The two men left the car and walked out of sight between an apartment building and a garage. Two to three minutes later, they returned to the car and drove away.

A short time later, after it was dark outside, Cross told Bulman she saw someone coming up behind the agents' car. The agents drew their sidearms from their holsters, and Cross got out of the car. As Bulman turned to open his door, he saw someone approach the rear of the car on the driver's side. Before Bulman could exit the car, the person opened the door and pointed a revolver at Bulman's head. Bulman recognized the man, who was wearing a

black leather jacket, as the driver of the brown car. The driver[2] told Bulman to raise his hands. After putting his pistol on the seat, Bulman raised his hands and identified himself as a police officer. The driver said he also was a police officer, but refused Bulman's request to allow Bulman to show his badge. He ordered Bulman to tell Cross to drop her weapon; instead, Bulman told Cross not to do so. While the driver had the revolver pressed against Bulman's temple, forcing his head toward the seat, Bulman heard Cross say, "What are you doing? Get your hands back up on the car." Bulman could not see what was happening on the other side of the car.

Several seconds later, another man appeared at the driver's door. Bulman could not see clearly who he was. While bent over, Bulman tried to use the police radio, but it did not work because the car's ignition was not turned on. Bulman again identified himself as an officer and mentioned the police radio as proof. Saying, "He's got a radio," the second man reached into the car, removed the keys from the ignition, and knocked the radio's microphone from Bulman's hand. That man then noticed the shotgun on the floor in the front of the car, said something like, "What do we have here," and took the shotgun.

Bulman testified that, almost immediately after the man with the shotgun left the driver's door and went behind the car, Cross jumped into the car through the front passenger's door. She went over the seat into the back, a panicked look on her face. A shotgun blast then came through the open passenger's door, the shot traveling across Bulman's lap and out through the driver's door.

Bulman grabbed the revolver pressed to his head and wrestled his way out of the car. As he did so, the driver fired the gun, but the bullet did not hit Bulman. While Bulman and the driver struggled on the street, Bulman heard two more shotgun blasts coming from the agents' car. The driver fired several more shots from the handgun during the struggle, but again Bulman was not hit. The struggle continued for three or four car lengths in front of the agents' car in the middle of Interceptor Street until the driver said, "Shoot the son of a bitch." After Bulman heard another person say, "I can't. You're in the way," Bulman saw the passenger aiming the agents' shotgun at him. The passenger was wearing a dark stocking cap and a dark-colored jacket.

Bulman and the driver next wrestled in the opposite direction, behind and past the agents' car, each trying to put the other's body towards the shotgun as the passenger tried to get a clear shot at Bulman. Near the corner of

---

[2] We refer to the men who confronted the agents as "driver" and "passenger," based on their positions in the car that had driven by the agents.

Interceptor and Belford, Bulman lost his balance and fell. As Bulman tried to get up, the passenger ran over and put the shotgun muzzle about six inches from Bulman's head. The passenger fired the weapon, but the shot missed Bulman and hit the pavement. The assailants then ran off.

When he realized he had not been shot, Bulman went to the car to get his pistol and check on Cross. She was lying on the backseat and had no pulse. Bulman ran to a Secret Service surveillance van parked nearby. He and Agent Terry Torrey, who was stationed in the van, then drove back to the car. Bulman did not see the shotgun, the keys to the agents' car, or Cross's pistol again.

Bulman was interviewed by agents that night and on numerous occasions in the following days, months, and years. He worked with a police sketch artist on June 6, 1980, and completed composite drawings of the suspects that were introduced into evidence at trial. Several of the interview sessions involved attempts to hypnotize Bulman in the hope of helping him to remember other details of the crime.

At a live lineup conducted on June 27, 1980, Bulman identified one subject, Terry Brock, as looking similar to the driver, the man with whom Bulman had struggled, except the person in the lineup had a beard. Bulman was unable to identify defendant Alexander as the passenger who fired the shotgun during a live lineup conducted on April 19, 1990, at the preliminary hearing, or at the trial. However, at trial, Bulman testified a picture of defendant Alexander taken around 1980 looked "closest" to the person with the shotgun, who was depicted on the left side of the composite sketch trial exhibit.

Agent Torrey testified that, minutes before Bulman ran to the surveillance van, he had seen a medium- to dark-colored car speeding on Belford Avenue with its lights off.

Wayne Dhaler was driving his car at the intersection of Belford and Interceptor at 9:00 p.m. the night of the murder. He testified he saw two men, one wearing a tan or brown jacket, leaning into the driver's side door of a car parked on the street.

Alvin Borges drove by the same area about the same time. He testified he saw two African-American men fighting with a White man who was on the ground. Borges saw one of the men shoot the man on the ground at almost pointblank range with a shotgun. The shooter, who used his right hand to pull the trigger and his left to hold the barrel, was wearing a brown, waist-length jacket. Borges testified the jacket later seized from defendant's parents' home "could be consistent" with the one the shooter had worn.

Harry Zisko testified he heard shots that evening while in his Belford Avenue apartment. He saw two men running down the street, one carrying a two-inch-diameter cylinder that was between one and one and a half feet long. Zisko heard metal hitting metal as they ran. Ten to 20 seconds later, a car waiting near the curb with its lights on pulled into the street, briefly went out of control, and then sped away with its lights off.

Frank Kerr, who lived on Belford Avenue, testified that, at approximately 9:00 p.m., he heard shouting, gunfire, and two people running on his street. Kerr then saw Bulman at the Secret Service car. When Bulman left, Kerr checked on Cross, saw she had been shot in the chest, and unsuccessfully tried to find any sign of life. Kerr stated that a person could go through a breezeway between apartment buildings on Interceptor and wind up at an ivy-covered chain-link fence that was "next to where the Secret Service car was on the night of June 4th." Kerr added that a person could "come around" the fence onto the street where the Secret Service car had been parked.

### b. *Crime Scene Evidence*

Analysis of the crime scene, the agents' car, and Cross's body indicated the first round fired from the shotgun, a slug, entered the front passenger door and exited through the driver's door. Cross was then shot with a round of buckshot likely fired from outside the front passenger's door. She next was shot in the chest at close range with the third round, another slug, which exited her back and traveled through the seat and floorboard. This shot probably was fired while the shooter leaned over the front seat and shot almost straight down. Each shotgun wound Cross suffered would have been fatal.

Los Angeles Police Detective Marvin Engquist testified there was a fine mist of blood splattered on the back of the front seat that was not captured on the crime scene photographs of the dark upholstery. Rod Englert, a crime scene reconstruction and bloodstain expert, testified the shotgun and the person who shot Cross would have been splattered with a fine mist of blood caused by the close-range shot into her chest.

Eyeglass frames, a broken eyeglass lens, and an eyeglass case were found in the street 57 feet in front of the agents' car and 13 feet from the curb. Agent Torrey interviewed people living in buildings nearby, but was unable to find anyone who owned the recovered eyeglasses.

The parties stipulated that on June 20, 1980, a Secret Service agent using a metal detector found a .38-caliber bullet buried in the ground between the sidewalk and chain-link fence on Interceptor, some distance in front of where

the agents' car had been parked. They also stipulated that the custodian of records at the Los Angeles County Coroner's Office determined there was no other reported homicide near the Los Angeles International Airport on June 4, 1980.

### c. Search of Defendant's Parents' House

On November 12, 1990, Los Angeles Police Detective Richard Henry served a search warrant at the home of defendant's parents. He found a brown leather jacket (the jacket) and a knit cap in a closet that defendant's mother said contained defendant's belongings. Henry also found a 1987 postcard addressed to defendant that reminded him to pick up his eyeglasses from an optometrist. Bulman testified the cap found in the closet was similar to the one worn by the passenger; "presumptive tests," providing a preliminary indication whether or not blood might be present on the hat, were negative.

Los Angeles Police Department Crime Laboratory technicians also conducted two presumptive tests, a phenolphthalein and a luminol test, for the presence of blood on the jacket. The tests resulted in positive reactions on a stain on the left sleeve and small pinpoint spots in the chest area. The parties stipulated the jacket was sent to another laboratory for further tests to confirm the presence of blood, that one "vigorous" swabbing of the sleeve's stain again resulted in a positive result in a presumptive test, but that other tests to confirm the presence of human blood on the jacket were negative. The parties stipulated the negative results in the confirmation tests could mean the jacket had (1) nonhuman blood on it, (2) only a trace amount of blood insufficient to yield a confirmatory result, or (3) no human blood on it. The parties also stipulated that a Federal Bureau of Investigation analyst determined there was insufficient DNA on the jacket for testing. The owner of the company that manufactured the jacket testified it was made no later than 1976, and would have been sold soon afterwards.

Harold Ross, the optometrist who prepared defendant's eyeglasses in 1987 and sent the reminder postcard, testified defendant's prescription was to correct nearsightedness. Another optometrist, Richard Hopping, examined the glasses found at the scene and determined the lens prescription corrected nearsightedness and would be especially helpful for driving at night. Both optometrists testified a change in a person's lens prescription like the difference between the lens found at the scene and defendant's prescription seven years later would be possible.

### d. Defendant's Refusal to Stand in a Lineup

On April 3, 1990, defendant was directed to stand in a live lineup related to the Cross murder investigation. A deputy at the jail testified that defendant,

who refused to stand in the lineup and became "boisterous" and "belligerent," signed a refusal form notifying him that the lineup was for the purpose of either eliminating or identifying him as a suspect involved in a crime and that his refusal to participate could be used in court to indicate "guilty knowledge." The form provided a space for defendant to explain his refusal. Defendant told the deputy he was refusing on "the advice of his attorney." Bernard Rosen, defendant's attorney in another matter, testified he had advised defendant to refuse to stand in the lineup but had added that defendant would have to participate if a judge so ordered. On April 19, 1990, pursuant to a court order, defendant did participate in a lineup at which Bulman failed to identify him.

### e. *Terry Brock*

Defendant's sister, Darcel Taylor, testified defendant and Terry Brock, the person whom Bulman identified as looking like the driver suspect in the murder, knew each other around the time of the Cross murder.[3] The Brock and Alexander families had been neighbors when Taylor was young, and defendant and Terry became "associates" after defendant and Jessica Brock had a child together. Taylor did not know whether defendant and Terry were "close associates" in 1980; she saw Terry "very seldom[ly]" in 1980 and 1981.

In February 1991, Taylor wrote to Terry asking whether he had been talking to the police about defendant. She did so because defendant had told her he was concerned that Terry was talking to the police about him, and he wanted Taylor to try to contact Terry to learn if that was true.[4]

April Watson, who had been Terry's girlfriend for several years, told Detective Henry that defendant contacted her in August and October of 1990, concerned that Terry might be talking to police. Defendant wanted Watson to find out where Terry was and to tell him to "stay strong." Henry confirmed that he and other officers had transported Terry from the Los Angeles County jail on several occasions in August and September of 1990.

Yvette Curtis, Terry's girlfriend from approximately 1977 to 1982, testified she met defendant through Terry around 1978 and had a brief affair with

---

[3] Terry Brock's brother and sister, Charles and Jessica, will be mentioned throughout this opinion. To simplify our discussion of the facts and law, we occasionally refer to the Brock siblings by first name.

[4] Taylor's testimony was contradictory regarding whether defendant actually instructed her to contact Terry, although she noted that he had instructed her to contact witnesses before, and that, this time, he had expressed concern that Terry "was trying to implicate [defendant]." Taylor stated, "We discussed it and I found him."

defendant in 1978 or 1979. During the affair, Curtis took a trip with defendant in which he drove a large truck north of Los Angeles to a place where the truck was unloaded. Defendant had worn glasses when driving at night. The frames of those glasses and their case were similar to the frames and case found at the crime scene. About a month after the trip, Terry confronted defendant about the affair and repeatedly hit defendant in the head with the butt of a gun. Despite that altercation, Curtis continued to see Terry and defendant together on occasion, and she knew they were associates at the time Cross was murdered.

Curtis testified that, just before 11:00 p.m. on June 4, 1980, Terry came to her apartment, looking nervous or excited. He said he needed "to watch the news" about the female Secret Service agent who was murdered "by the airport." Curtis added that she had seen Terry with a .38-caliber revolver two weeks before the murder.

Defendant's address book, recovered by law enforcement in May 1991, contained a telephone number for Terry Brock and April Watson.

### f. *Defendant's Employment at Swift Foods*

Both Arthur Jackson and defendant drove trucks for Swift Foods in Los Angeles in 1980. Jackson testified defendant drove a particular tractor-trailer truck for deliveries to San Francisco and that the truck would be gone on Monday and Thursday mornings when Jackson came to work. On a few occasions, Jackson was at work when defendant returned from San Francisco on Tuesday and Friday evenings. Jackson had seen defendant driving a medium-sized faded brown car with a lighter-colored top.

Richard Lamirande, warehouse manager at Swift Foods from 1977 to 1979, testified that, during those years, defendant usually left Sunday night to make a delivery to San Francisco and returned Tuesday afternoon, left Thursday morning to make another delivery and returned Friday afternoon. Lamirande said the seized jacket looked like one defendant wore while they worked at Swift Foods.

### g. *Jessica Brock*

Jessica Brock, Terry's sister, had a child by defendant in May 1978. Her testimony varied between direct and cross-examination and was inconsistent with her various prior out-of-court statements to police and the defense. The version most helpful to the prosecution was based primarily on a statement she gave police in 1990. In that version, Jessica said defendant came to her apartment after midnight the night of the Cross murder with "blood spatters,

little specks of blood" on his chest and left arm and was carrying a bag containing what looked like a dark "crowbar" and a wooden object that could have been the butt of a handgun. He washed blood off of the crowbar-like object, was very concerned about whether police were outside the apartment, and told Jessica he had had to "take somebody out" near the airport, that "it was either him or them." When police later showed Jessica the barrel of a Secret Service shotgun with its unique handguard, she said it was "exactly" the same item she had seen defendant carry and clean that night. She said around 1980 defendant often wore knit caps similar to the one seized from his parents' house. Jessica testified her relationship with defendant ended because he had an affair with Eileen Smith.

Jessica felt pressured by defendant's family and her own family not to testify. She testified defendant's mother told her she was the prosecution's star witness and there was no case against defendant without her testimony.

### 2. *Defense Evidence*

Beverly Perry and Luis Jimenez, both employees of Swift Foods, testified they did not see defendant wearing eyeglasses around 1980. Carlos Jimenez also worked at Swift Foods; he testified he did not recall seeing defendant wear glasses around 1980.

In 1980, Nina Miller was the girlfriend of Charles Brock, brother of Terry and Jessica. Miller testified, and earlier had given a statement to police to the same effect, that in the early morning hours of June 5, 1980, she, Charles, and others picked up a friend at the Venice police station and returned to the friend's apartment. Terry was waiting at the apartment building, lying in his car. Once inside, Terry participated in sawing off the barrel of a shotgun and demonstrated shooting that gun, saying, "This is how I shot it." Miller said that, at a later date, she heard Charles say "the Secret Service agent must have played dead" because the agent had not picked Charles out of a lineup. She added that Charles once described to her a shotgun with a folding stock like the Secret Service shotgun.

Eileen Smith had a romantic relationship with defendant and lived with him in 1980. She testified she never saw defendant wear prescription glasses before 1981, when she helped him buy a pair. She said in 1980 defendant drove a black Buick Park Avenue and that he sometimes had made deliveries for Swift Foods in the middle of the week and was gone on Wednesdays. She said there were other jackets in the closet Detective Henry searched, and that some clothes in it belonged to her, her son, and defendant's brother. Smith testified that defendant did not "hang out" with Terry after Terry hit defendant in the head with a gun.

Defendant's father testified Jessica Brock told him she had lied in her statements to police after they had threatened her but that she would tell the truth at trial. He denied ever having contacted witnesses to pressure them not to testify or to change their testimony, although the prosecutor cross-examined him regarding his contacts with various witnesses in the case. He also denied previously trying to "pay off" a witness in a case against defendant involving a person named Dorothy Tyre.

Former Los Angeles Police Detective Michael Thies testified that, in Bulman's statements to police after the murder, Bulman did not say the struggle with the driver initially occurred in front of the agents' car. Bulman's description of the suspect with the shotgun contained in Thies's report and the all-points bulletin Thies issued did not include that that suspect had a mustache, although the final composite of that individual did. Thies said he believed Bulman told him during their initial interview that the suspect with the shotgun had a mustache, but he agreed that he normally would have included such an important detail in his notes and the bulletin if Bulman had so stated. Secret Service Agent Frank Renzi testified his notes of Bulman's description of the suspect with the shotgun similarly did not include mention of a mustache, but he added that he might not have heard that part of Bulman's description of that suspect. Renzi's notes indicated that Bulman did describe the other suspect as having a neatly trimmed moustache.

### 3. *Prosecution Rebuttal Evidence*

Kevin McHugh worked at Swift Foods between 1977 and 1980. He testified he twice saw defendant wearing eyeglasses while reading.

Detective Henry testified that, in a call intercepted pursuant to a court-authorized wiretap, defendant's mother told Eileen Smith that, at defendant's request, she was listing things she wanted Smith to remember for her testimony that might help defeat a pending motion in the case. Henry also testified that the closet he searched appeared to contain only defendant's clothes. Henry added that, shown the barrel of a Secret Service shotgun, Jessica Brock told him it was the object she had seen defendant "washing the blood off of." Henry also testified Jessica described a square wooden bottom of the "gun butt" of a revolver as the object she saw protruding from the bag defendant brought to her apartment on June 5, 1980.

Dorothy Tyre testified defendant took coins, checks, a purse, and a wallet from her on December 17, 1972. Tyre said she pressed charges against defendant despite his parents' attempts to persuade her not to do so.

### 4. *The Special Circumstances Allegations*

During a bifurcated portion of the guilt trial, the prosecution, in support of the prior-murder special-circumstance allegation, presented defendant's certified prison records and fingerprint records, which established that on July 19, 1990, he was convicted of three counts of first degree murder.[5] Detective Henry, the investigating officer in that case, testified he was in court when the jury convicted defendant of those murders. During this part of the trial, the prosecution did not present any new evidence related to the robbery-murder special circumstance, and no defense evidence was presented.

## B. *Penalty Phase*

### 1. *Prosecution Evidence*

The prosecution presented evidence concerning six prior incidents of defendant's criminal behavior. On April 8, 1970, defendant was stopped for driving an unsafe car that was too low to the ground. Defendant was verbally abusive to the police officers. He was arrested after he tried to run away when they issued him a ticket. On December 17, 1972, defendant and another person, both armed with revolvers, entered Dorothy Tyre's home and robbed her of several items. This incident led to defendant's conviction on July 17, 1973, for first degree robbery and first degree burglary, with an enhancement for being armed with a firearm. On May 30, 1977, defendant was part of a crowd of bystanders who interfered with police officers in the process of arresting two men. Defendant had to be handcuffed and placed in a patrol car so that the officers could complete the arrest safely. On July 25, 1984, defendant shot James Williams in the arm for no apparent reason. The two men lived in the same apartment complex. On April 9, 1988, while incarcerated in a Los Angeles County jail, defendant struck a sheriff's deputy and held him in a chokehold. Other deputies had to physically subdue defendant. The prosecution also presented several photographs of the crime scene and the victims in the triple murder of which defendant was convicted in 1990. Two of the victims had been shot in the head.

Cheryl Meyers, a San Diego Police Department captain who had worked with Julie Cross before she joined the Secret Service, Cross's older brother, and Agent Bulman testified about Agent Cross and the impact her death had on them. Bulman then testified about how he personally was affected by the events of June 4, 1980.

---

[5] The triple murder was committed in 1978. The Court of Appeal affirmed the convictions on June 10, 1993, in an unpublished decision, and we denied review on September 1, 1993.

### 2. *Defense Evidence*

Deputy Sheriff Dave Sher testified defendant caused no problems and served as spokesman for inmates on his row while confined in the county jail during the trial proceedings. Lazaro Simone, a jail inmate, testified defendant was helpful and generous toward other inmates and was respectful toward jail staff.

Defendant's parents, two siblings, four children, current and former girlfriends Debra Edwards and Eileen Smith, and a family friend testified consistently with each other concerning defendant's history. They described him as a loving and supportive son, brother, and father who fell into trouble due to drug use and associating with the wrong people. Defendant voluntarily entered a drug treatment program in approximately 1984. These witnesses, and an officer of the Swift Foods corporation while defendant worked there, described defendant as a hard and conscientious worker. Defendant's family members testified that, in their view, defendant did not deserve the death penalty.

Defendant recounted his personal history and tried to explain or minimize his culpability in the criminal incidents the prosecution presented in aggravation. He denied committing the triple murder and the murder of Agent Cross.

## II. DISCUSSION

### A. *Pretrial Claims*

#### 1. *Denial of Motion to Appoint Madelynn Kopple as Trial Counsel*

Defendant contends the trial court abused its discretion by denying his request to continue Madelynn Kopple's appointment as his attorney and thereby violated his state and federal right to the assistance of counsel.[6] In

---

[6] In this claim and most others on appeal, defendant contends the asserted error or misconduct he raises infringed various of his state and federal constitutional rights to a fair and reliable trial. What we stated in *People v. Boyer* (2006) 38 Cal.4th 412, 441, footnote 17 [42 Cal.Rptr.3d 677, 133 P.3d 581] (*Boyer*), applies in the present case: "In most instances, insofar as defendant raised the issue at all in the trial court, he failed explicitly to make some or all of the constitutional arguments he now advances. In each instance, unless otherwise indicated, it appears that either (1) the appellate claim is of a kind (e.g., failure to instruct sua sponte; erroneous instruction affecting defendant's substantial rights) that required no trial court action by the defendant to preserve it, or (2) the new arguments do not invoke facts or legal standards different from those the trial court itself was asked to apply, but merely assert that the trial court's act or omission, insofar as wrong for the reasons actually presented to that court, had the additional *legal consequence* of violating the Constitution. To that extent, defendant's new

response to the People's claim that review of this decision is barred by the "law of the case" doctrine, he claims the doctrine does not apply because "exceptional circumstances" justify review, namely that the Court of Appeal's decision is "manifestly unjust." (See *England v. Hospital of Good Samaritan* (1939) 14 Cal.2d 791, 795 [97 P.2d 813].)

### a. *Background*

On October 1, 1992, defendant was remanded into custody for the Cross murder. He asserted his rights under *Faretta v. California* (1975) 422 U.S. 806 [45 L.Ed.2d 562, 95 S.Ct. 2525], and was granted leave to proceed in propria persona. Attorney Madelynn Kopple was appointed as advisory counsel. On March 10, 1993, she submitted an attorney substitution form, seeking to have herself appointed as attorney of record. She withdrew her request once told she could not be appointed and receive payment for her services without following local requirements for capital appointments, including that the public defender and alternate defense counsel first decline appointment and that the appointment must be filled by an attorney on the Central District's death penalty "bar panel."

The preliminary hearing was set for July 13, 1993. Kopple filed four motions prior to that date: a motion to continue the hearing; a 45-page motion to strike the prior-murder special-circumstance allegation; an 11-page motion to suppress testimony of witnesses who were hypnotized during the police investigation; and a 10-page motion to dismiss the case for prejudicial prearrest delay. Kopple signed these motions as defendant's "advisory counsel." Defendant did not sign them.

The motion to continue was based on the fact that Kopple was scheduled to be in trial on an unrelated case. At the May 24, 1993 hearing on that motion, Kopple said she was appearing "on behalf of" defendant, and she referred to this motion and the motion to strike as motions that "I filed." Other than agreeing to the continuance, defendant said nothing at that hearing.

At a hearing on July 7, 1993, Kopple appeared without defendant and said he would be making a motion to substitute her as attorney of record. She presented declarations from the public defender and alternate defense counsel stating they would not represent defendant because of conflicts of interest. Despite acknowledging what the court described as a "hullabaloo" regarding

---

constitutional arguments are not forfeited on appeal. [Citations.] [¶] In the latter instance, of course, rejection, on the merits, of a claim that the trial court erred on the issue actually before that court necessarily leads to rejection of the newly applied constitutional 'gloss' as well. No separate constitutional discussion is required in such cases, and we therefore provide none."

her qualifications, Kopple represented that she was on the "bar panel" and qualified to receive a special circumstances appointment, and that she understood it was "mandatory" that the court appoint her because she had been advisory counsel for over six months. She added, "I'm thoroughly familiar with the case," defendant "wants me as lead counsel," and, if she were not appointed as counsel of record, defendant would not be ready to proceed with the preliminary hearing scheduled to start the following week.

On July 12, 1993, defendant filed a motion to substitute Kopple as counsel of record; the next day, the court indicated it had told the court clerk that Kopple "would qualify to serve as counsel," granted the motion, and terminated defendant's in propria persona status. Kopple represented defendant during the preliminary hearing, after which the court denied the motion to strike the prior-murder special-circumstance allegation and denied, without prejudice, the motion to dismiss for delay. The court excluded no testimony based on a witness's having been hypnotized.

Defendant was bound over to superior court and, on August 2, 1993, he was arraigned before Judge Ito. Kopple appeared with defendant but did not mention that she had been *appointed* as counsel in municipal court. Judge Ito assigned the matter to Judge Horan for trial. Later that morning, when Judge Horan questioned her status as appointed counsel, Kopple said she had been appointed in municipal court and assumed her appointment would continue. Judge Horan returned the matter to Judge Ito to clarify Kopple's status because she was "not on the list," presumably a reference to "the Superior Court's approved list of death penalty case attorneys." That afternoon, Judge Ito commented that he had assumed Kopple "was privately retained since she had announced ready to proceed with the arraignment and did not request to be appointed to represent [defendant]." Kopple reiterated that she had not mentioned her status as appointed counsel because she assumed the appointment automatically would continue. Judge Ito relieved her because, he said, given the charge, "this is something I have to refer to our contract," presumably another reference to the arrangements for appointments in special circumstances cases. Kopple then produced written opposition to her removal as defendant's attorney. When Judge Ito took the opposition under submission and set a hearing for the next day, Kopple noted that she had filed a motion for the appointment of Attorney Barry Levin as cocounsel and asked the court to consider that motion as well. Judge Ito conducted an in camera hearing on August 3, 1993, after which he appointed Attorney Penelope Watson as defendant's counsel, subject to her evaluation of whether she could accept the appointment and to Judge Ito's continued consideration of defendant's opposition to Kopple's removal.

Judge Ito issued a written order declining to appoint Kopple as defendant's attorney, noting that she had applied for, but was denied, admission to "the

Superior Court's approved list of death penalty case attorneys." The order expressed concern that Kopple had acted inappropriately as de facto counsel of record in municipal court, by improperly "billing for services not necessary or authorized," including filing the motion to strike a special circumstance allegation, and generally preparing for trial, when she had been appointed only as advisory counsel for the preliminary hearing. The order noted that Kopple submitted bills totaling over $50,000 for work as advisory counsel for the period up to one month before the preliminary hearing, an amount Judge Ito found to be "excessive." Judge Ito found that Kopple's actions "operated as a subterfuge to allow [defendant] to retain the in custody privileges" afforded a self-represented defendant while having counsel "present [his] case." The order noted that defendant based his preference for Kopple's appointment on no "specific or unique reason" other than his trust and confidence in her. Finding no indication that "Kopple alone possesses a quality or talent necessary to represent [defendant]," and that the credibility and substance of the "claim of preference" was "undermine[d]" by his agreeing to the motion to appoint Cocounsel Levin, who had "no prior contact with either the case or [defendant]," Judge Ito continued Watson's appointment and referred the case to the trial court.

On August 17, 1993, defendant challenged Judge Ito's refusal to continue Kopple's appointment by filing a petition for writ of mandate in the Court of Appeal. That court denied the writ because the supplied record was insufficient for adequate review, and because, based on the record provided, defendant failed to demonstrate an abuse of discretion. We granted the petition for review and transferred the matter to the Court of Appeal with directions to vacate its order denying mandate and to issue an alternative writ to be heard before that court. After briefing and oral argument, the Court of Appeal denied the petition, concluding the trial court had not abused its discretion. (*Alexander v. Superior Court* (1994) 22 Cal.App.4th 901 [27 Cal.Rptr.2d 732].) The Court of Appeal denied defendant's petition for rehearing, and, on May 19, 1994, we denied defendant's petition for review and request for depublication of the decision.

While the mandate petition was under review, defendant filed two motions in the trial court pursuant to *People v. Marsden* (1970) 2 Cal.3d 118 [84 Cal.Rptr. 156, 465 P.2d 44] (*Marsden*), to have Watson removed from serving as his attorney. After those motions were denied, defendant filed a new motion to proceed in propria persona, which was granted on March 30, 1994. On April 13, 1994, Attorney Robert Gerstein was appointed for the limited purpose of filing a motion for reconsideration of the order removing Kopple, and Attorney Rowan Klein was appointed as advisory counsel for defendant in the trial proceedings.

The motion for reconsideration was supported by new declarations by Kopple, defendant, his father and sister, Attorneys Richard Millard, Howard Gillingham, Barry Levin, and Gigi Gordon, and a report by Dr. Samuel Miles, a psychiatrist who "explore[d] [defendant's] motivation" for wanting Kopple to represent him. After a hearing on the motion, in a written order filed June 13, 1994, Judge Ito denied the motion because the "purported cost savings, while usually an important factor, does not override the court's previously expressed concerns for the integrity of the [appointment] process in this particular case under these unique circumstances." The court considered that, at the time of its original ruling removing Kopple, she made "unprofessional" comments about the trial court and Court of Appeal, and that she unsuccessfully had applied for admission to the Orange County Superior Court's capital case attorney panel. Judge Ito also found that the new report and Dr. Miles's comments amounted to "an embellishment of comments already made" and failed to demonstrate special circumstances that "require[d]" him to appoint Kopple.

On July 26, 1994, at defendant's request, Klein was appointed as counsel of record. Klein represented defendant through the completion of the trial.

### b. *Discussion*

■ "The law of the case doctrine states that when, in deciding an appeal, an appellate court 'states in its opinion a principle or rule of law necessary to the decision, that principle or rule becomes the law of the case and must be adhered to throughout its subsequent progress, both in the lower court and upon subsequent appeal . . . , and this although in its subsequent consideration this court may be clearly of the opinion that the former decision is erroneous in that particular.' [Citations.]" (*Kowis v. Howard* (1992) 3 Cal.4th 888, 892–893 [12 Cal.Rptr.2d 728, 838 P.2d 250].) The doctrine "can apply to pretrial writ proceedings. When the appellate court issues an alternative writ, the matter is fully briefed, there is an opportunity for oral argument, and the cause is decided by a written opinion. The resultant holding establishes law of the case upon a later appeal from the final judgment." (*Id.* at p. 894.)

Here, defendant sought review of the initial order removing Kopple from the case by filing a pretrial petition for writ of mandate. An alternative writ issued, the Court of Appeal decided the matter in a published opinion, and we denied review. The Court of Appeal's conclusion that the trial court's initial order was not an abuse of discretion is law of the case. The claim that we should nonetheless revisit this order based on "exceptional circumstances" fails because defendant, in essence, simply asks us to reweigh the evidence presented below. (See *People v. Martinez* (2003) 31 Cal.4th 673, 683–688 [3 Cal.Rptr.3d 648, 74 P.3d 748] [law of the case doctrine applies unless

existing principles have been manifestly misapplied, resulting in substantial injustice, or intervening decisions have clarified the law].)

However, the law of the case doctrine does not bar review of the trial court's denial of the motion for reconsideration, which addressed new evidence and arguments and was not the subject of review. (*Boyer, supra,* 38 Cal.4th at p. 442 ["the law-of-the-case doctrine governs only the *principles of law* laid down by an appellate court, . . . and it controls the outcome [in subsequent proceedings] only to the extent the evidence is substantially the same"].) We therefore review the denial of the motion to reconsider for abuse of discretion. (*Drumgo v. Superior Court* (1973) 8 Cal.3d 930, 934–935 [106 Cal.Rptr. 631, 506 P.2d 1007] ["appointment of counsel to represent an indigent rests . . . in the sound discretion of the trial court . . ."]; see also *Harris v. Superior Court* (1977) 19 Cal.3d 786, 799 [140 Cal.Rptr. 318, 567 P.2d 750] (*Harris*) [trial court abused its discretion when considerations in support of appointment "heavily outweighed" contrary factors, such that "only one conclusion [was] possible"]; *People v. Cole* (2004) 33 Cal.4th 1158, 1187 [17 Cal.Rptr.3d 532, 95 P.3d 811] [trial court does not abuse its discretion when nothing in the record demonstrates "the relationship between defendant and [requested counsel] ever approached the depth of the relationship between the petitioners and their requested counsel in *Harris*"].) Although, under the law of the case, we do not directly review the initial decision to remove Kopple, our review of the denial of the motion for reconsideration requires that we evaluate the reasons underlying the initial order to the extent the court weighed defendant's new evidence and arguments against its "previously expressed concerns for the integrity of the process."

■ As we recently stated, the Sixth Amendment to the federal Constitution guarantees the right to the assistance of counsel for a defense, but this guarantee "is subject to an important limitation, however: '[T]he right to counsel of *choice* does not extend to defendants who require counsel to be *appointed* for them.' [Citation.]" (*People v. Noriega* (2010) 48 Cal.4th 517, 522 [108 Cal.Rptr.3d 74, 229 P.3d 1].) Similarly, the " 'state Constitution does not give an indigent defendant the right to *select* a court-appointed attorney,' but a trial court may abuse its discretion in refusing to appoint an attorney 'with whom the defendant has a long-standing relationship.' [Citation.]" (*Id.* at p. 523.) In deciding whether a particular attorney should be appointed to represent an indigent defendant, a trial court considers subjective factors such as a defendant's preference for, and trust and confidence in, that attorney, as well as objective factors such as the attorney's special familiarity with the case and any efficiencies of time and expense the attorney's appointment would create. (*People v. Chavez* (1980) 26 Cal.3d 334, 346 [161 Cal.Rptr. 762, 605 P.2d 401].) Defendant was not asking to *retain* counsel of his own choosing. ■ However, even in cases involving the defendant's

constitutional right to retain an attorney of his choosing, that right can be forced to yield if the court determines the appointment at issue will result "in a disruption of the orderly processes of justice unreasonable under the circumstances of the particular case." (*People v. Crovedi* (1966) 65 Cal.2d 199, 208 [53 Cal.Rptr. 284, 417 P.2d 868]; see *People v. Jones* (2004) 33 Cal.4th 234, 244–245 [14 Cal.Rptr.3d 579, 91 P.3d 939] [removal, against a defendant's wishes, of defense counsel because of potential conflict of interest does not violate our state Constitution].) A trial court has "wide latitude in balancing the right to counsel of choice against the needs of fairness [citation] and against the demands of its calendar [citation]. The court has, moreover, an 'independent interest in ensuring that criminal trials are conducted within the ethical standards of the profession and that legal proceedings appear fair to all who observe them.' [Citation.]" (*United States v. Gonzalez-Lopez* (2006) 548 U.S. 140, 152 [165 L.Ed.2d 409, 126 S.Ct. 2557].)

Here, it was apparent to Judge Ito that, although Kopple had planned to become counsel of record since at least March 10, 1993, she did not pursue appointment at that time and chose to continue as "advisory counsel" because payment for her services as lead counsel was not guaranteed. The court reasonably found that Kopple nonetheless prepared the case as though she would represent defendant as lead counsel at the preliminary hearing and beyond, billing an inordinate number of hours for her advisory role in proceedings prior to that hearing. A week before the scheduled hearing, Kopple renewed her request for appointment as lead counsel, having taken steps to ensure she would be paid, while notifying the municipal court that defendant, who on the record was his own attorney, would be unprepared to proceed if she were not appointed. Judge Ito reasonably was concerned that Kopple had acted as de facto counsel of record without seeking permission, and perhaps had done so to allow defendant to maintain his in propria persona status in jail while being represented. In addition, Judge Ito reasonably considered Kopple's conduct at defendant's arraignment and subsequent hearings the same morning that called into question her ethics and honesty as an officer of the court.[7] Judge Ito also reasonably questioned Kopple's fitness for the appointment based on events that occurred after her removal from the case. Although the record does not contain the "unprofessional" comments Kopple made after denial of defendant's mandate petition, defendant's counsel for the motion to reconsider described them as "very unfortunate" and regrettable. The court similarly reasonably recognized that the denial of

---

[7] That day Kopple told two judges she "assumed" her municipal court appointment would continue in superior court, but the trial court was aware that her immediate presentation of an already prepared opposition to her removal once she was disabused of that supposed assumption suggested her failure to mention her status as previously appointed counsel had not been an oversight.

Kopple's application for admission to Orange County Superior Court's capital case appointment panel weakened her claim of fitness for appointment, as did the fact that she previously had been denied admission to the capital case panel in the Los Angeles County Superior Court.

The court reasonably found the evidence assertedly showing that defendant personally preferred Kopple as his attorney, and that her appointment would create time and monetary savings, did not outweigh concerns about the integrity of the judicial process in this case. That finding revealed no " 'arbitrary determination, capricious disposition or whimsical thinking.' " (*Harris, supra,* 19 Cal.3d at p. 796.) The court correctly noted that, unlike the circumstances in *Harris,* Kopple's claim of special familiarity with the charges against defendant did not extend beyond this very case; it also pointed out that to give weight to the fact Kopple was familiar with the evidence and allegedly could proceed to trial more quickly and at less cost than newly appointed counsel could reward her for improperly acting as de facto lead counsel while appointed only as advisory counsel. Furthermore, the court properly found nothing in the record to indicate defendant's trust and confidence in Kopple or her role in preparing his defense was so unique that his right to effective assistance would be affected negatively if Kopple did not represent him.[8] In addition, as the court noted, the fact that defendant acquiesced in Kopple's request for the appointment of Cocounsel Levin, an attorney with whom defendant had no apparent prior relationship, weakened his claim that he could trust only Kopple to handle his defense. In that regard, we note that defendant's supposed difficulty in trusting and cooperating with any attorney other than Kopple appears to have evaporated once the issue of her representation was not being pursued and Attorney Klein was appointed as lead counsel at defendant's request.

We conclude the trial court did not abuse its discretion by denying the motion to reconsider its order removing Kopple. Because we conclude there was no abuse of discretion, we do not consider whether defendant was prejudiced by Kopple's absence from the case or whether any error in removing her would have been reversible without showing prejudice.

---

[8] Defendant's asserted difficulties with Attorney Watson are irrelevant in evaluating whether it was *necessary* that Kopple represent him. The proper course for addressing alleged deficiencies in Watson's representation was to file a motion to substitute counsel pursuant to *Marsden, supra,* 2 Cal.3d 118, which defendant twice did. The trial court denied both motions, and defendant has not challenged those rulings on appeal. Whether Watson adequately represented defendant is a separate question from whether the trial court abused its discretion by declining to reconsider its order appointing *some* attorney other than Kopple to represent defendant.

## 2. *Denial of Motion to Dismiss Based on Delay in Bringing Charges*

Agent Cross was murdered on June 4, 1980, but defendant was not charged with this crime until October 1, 1992. He contends the trial court violated his state and federal rights to due process and a fair trial by denying his motion to dismiss the charges because of this delay.

■ "Delay in prosecution that occurs before the accused is arrested or the complaint is filed may constitute a denial of the right to a fair trial and to due process of law under the state and federal Constitutions. A defendant seeking to dismiss a charge on this ground must demonstrate prejudice arising from the delay. The prosecution may offer justification for the delay, and the court considering a motion to dismiss balances the harm to the defendant against the justification for the delay. [Citations.]" (*People v. Catlin* (2001) 26 Cal.4th 81, 107 [109 Cal.Rptr.2d 31, 26 P.3d 357].) " 'In the balancing process, the defendant has the *initial* burden of showing some prejudice before the prosecution is required to offer any reason for the delay [citations]. The showing of prejudice requires some evidence and cannot be presumed. [Citations.]' " (*People v. Morris* (1988) 46 Cal.3d 1, 37 [249 Cal.Rptr. 119, 756 P.2d 843].)

On appeal defendant challenges the trial court's finding that the loss of three types of evidence due to the delay in filing the charges did not prejudice him. The lost evidence included audio recordings of interview sessions at which investigators tried to hypnotize Agent Bulman and other witnesses; medical records from an unknown optometrist who may have prescribed defendant glasses in 1981; and swabs used in the presumptive phenolphthalein blood test on the seized jacket. The challenged finding of no prejudice was made after a hearing on the motion to dismiss at which defendant and other witnesses testified. With regard to the items addressed on appeal, we conclude substantial evidence supports the trial court's finding that defendant failed to prove prejudice, and the trial court therefore properly denied the motion as to those items. (See *People v. Hill* (1984) 37 Cal.3d 491, 499 [209 Cal.Rptr. 323, 691 P.2d 989] [prejudice, a factual question for the trial court, is reviewed for substantial evidence].)[9]

---

[9] In the trial court defendant unsuccessfully argued that he was prejudiced by the delay due to loss of his June 1980 employment records from Swift Foods and the loss of witnesses who may have been able to support a claim of third party culpability for the murder, but who became unavailable or claimed loss of memory at the time of trial. He has waived any claims regarding those aspects of the trial court's decision by not raising those claims on appeal. (*People v. Rundle* (2008) 43 Cal.4th 76, 121 [74 Cal.Rptr.3d 454, 180 P.3d 224] (*Rundle*); see Cal. Rules of Court, former rule 14(a)(1)(B), now rule 8.204(a)(1)(B).)

### a. *Audiotapes of Hypnosis Sessions*

Various witnesses involved in this case, including Agent Bulman, attended interview sessions conducted by the Los Angeles Police Department during which an interviewer attempted to hypnotize them. The parties disputed whether any such attempt at hypnosis was successful, particularly focusing on whether Bulman ever was hypnotized. (See, *post*, pt. II.A.4.) Audio recordings of the sessions were made. Police Captain Michael Nielsen testified at the pretrial motions hearing that he was in charge of periodically reviewing the department's inventory of recordings of hypnosis sessions and deciding whether to retain or erase the tapes. In 1984, Nielsen decided the tapes of hypnosis sessions from this case should be erased because the reports indicated that no information not already known from prior interviews had resulted from the sessions, and, in Nielsen's view, the tapes were of no evidentiary value because investigators present at the sessions would have taken notes and prepared reports of what transpired.[10] Nielsen did not listen to the tapes before ordering their destruction.

Defendant contends the destruction of the tapes prejudiced him because they contained statements about what witnesses saw or heard about the murder, and the tapes of Bulman's sessions may have helped show that Bulman had been hypnotized, which would have aided defendant's motion to preclude Bulman from testifying at trial. Neither contention is persuasive. To the extent defendant argues the tapes may have included statements not contained in, or that contradicted, the investigators' reports or witnesses' testimony at the preliminary hearing or trial, his claim is based on speculation, not proof of actual prejudice. To the extent the tapes contained the same statements contained in the reports and testimony of the witnesses, they would have been cumulative. To the extent the reports and witness testimony conflicted, defendant was able to point out the inconsistencies to the jury without the tapes. Although, as even Nielsen testified, it might have been preferable to save the tapes, defendant has not demonstrated that he actually was prejudiced by their destruction.

### b. *Record of 1981 Eyeglass Prescription*

Defendant testified at the hearing that he did not wear prescription eyeglasses before 1981 or 1982, when he went to an eye doctor on Van Nuys Boulevard. Defense investigators testified they were unable to locate any records regarding defendant's 1981 or 1982 prescription for eyeglasses from

---

[10] The parties disputed whether certain tapes were erased on Nielsen's order, or whether they were blank due to malfunctioning equipment, but it does not appear the trial court resolved this issue. Even assuming all the tapes were erased purposefully, our analysis and conclusion are not affected.

any optometrist who practiced in that area during that time period. Defendant argues he was prejudiced because the optometrist's records may have indicated the glasses he received in 1981 or 1982 were his first prescription eyeglasses, from which he could argue that those found at the murder scene could not have been his.

Defendant's claim that the missing records might establish his first eyeglass prescription was in 1981 or 1982 is based on speculation. It is questionable whether defendant sufficiently established that these records ever existed, whether or not they confirmed when he first wore prescription eyeglasses. The only evidence supporting a claim that he bought prescription eyeglasses in 1981 or 1982 was his own testimony, and the triple-hearsay testimony of a defense investigator that defendant's girlfriend, Eileen Smith, told him she talked with a doctor who was in the area during that period and who told her she accurately had described his office interior. Although Smith also testified at trial that defendant bought prescription eyeglasses in 1981, defendant never presented corroboration of his or her testimony through receipts or other records.

In any event, if there were optometrist records from those years stating that defendant previously had not worn prescription eyeglasses, such information, as defense counsel acknowledged at the hearing, would be based on defendant's statements to the doctor, not the doctor's personal knowledge. Even if records of defendant's treatment generally would have been admissible under the business records exception to the hearsay rule (Evid. Code, § 1271), any statement by defendant in the missing records that this was his first eyeglass prescription would have been inadmissible in light of its double-hearsay nature. Defendant has not explained how the records otherwise could have led to admissible evidence on the issue. (*People v. Hamilton* (1963) 60 Cal.2d 105, 131 [32 Cal.Rptr. 4, 383 P.2d 412] [the business records exception, under then effective § 1953f of the Code Civ. Proc., did " 'not make the record admissible when oral testimony of the same facts would be inadmissible' "]; see also *People v. Williams* (1960) 187 Cal.App.2d 355, 365 [9 Cal.Rptr. 722] [a medical history given to a physician is not admissible "as substantive proof of the facts so stated" by the patient]; cf. Evid. Code, §§ 1251 [statement of declarant's previously existing physical state only admissible if declarant is unavailable and the physical state is itself an issue in the action and is not offered to prove any other fact], 1252 [statements for purpose of medical diagnosis or treatment are admissible only when made by a minor describing an act of child abuse].) We also note that at trial defendant presented testimony of several witnesses who said he did not wear prescription glasses at the time of the murder. Accordingly, substantial evidence supports the trial court's finding that defendant's inability to locate the alleged optometrist's records did not actually prejudice his defense.

### c. *Swabs from the Presumptive Blood Test on Defendant's Jacket*

Gregory Matheson, a Los Angeles Police Department laboratory forensic chemist, performed the phenolphthalein test on the stain on the seized jacket. Matheson testified at the motion hearing that, if there is blood on a swab taken from a stain on an item, there will be an immediate change in color when chemical reagents used in the test are added. Matheson explained that all swabs subjected to the test turn the same color within five minutes even if there is no blood, and that the reagents destroy the substance on the swab being tested. Thus, Matheson discarded the swabs once he had observed the immediate color change that presumptively indicated the presence of blood.

This testimony established that swabs generated in the phenolphthalein test were not lost through delay in bringing the charges; rather, they were discarded soon after the test was complete because their evidentiary value dissipated within minutes of the test. Even if defendant had been charged or brought to trial on the day the tests were performed and the swabs still were available, they would have been of no apparent evidentiary value. Similarly, to the extent defendant contends Matheson's failure to photograph the reaction constitutes prejudicial loss of evidence, even assuming such photographs could have served any evidentiary purpose, no connection exists between the absence of photographs and the delay in bringing the charges. We also observe that defendant has provided no evidence to indicate that preserving the test results would have been helpful to him, other than speculation that perhaps the results were inconsistent with Matheson's testimony. The likelihood that defendant's speculation is accurate is lessened by the fact that the second lab also reported a positive phenolphthalein test result on the same jacket stain. For these reasons, the trial court's finding that defendant failed to show prejudice from prearrest delay regarding the "loss" of the swabs was supported by substantial evidence.

### 3. *Denial of Motion to Dismiss for Failure to Preserve Evidence*

In the trial court defendant also filed a motion to dismiss pursuant to *California v. Trombetta* (1984) 467 U.S. 479 [81 L.Ed.2d 413, 104 S.Ct. 2528] (*Trombetta*) and *Arizona v. Youngblood* (1988) 488 U.S. 51 [102 L.Ed.2d 281, 109 S.Ct. 333], for violation of his due process rights based on the police department's failure to preserve exculpatory evidence. The motion encompassed the June 6, 1980 tape recording of the attempted hypnosis session with Agent Bulman, the original composite drawings Bulman and the police sketch artist created, and the blood test swabs. The trial court denied the motion, finding defendant had not shown that the missing evidence had any exculpatory value. Defendant challenges this ruling.

The police sketch artist who prepared the composite drawings testified at the preliminary hearing that they were completed before Bulman's hypnosis session on June 6, 1980. Following the artist's normal procedures, those drawings were photocopied, and then minimal modifications may have been made to them after the hypnosis session. The original drawings could not be found at the time of the preliminary hearing, but photographs of the original drawings were admitted at trial. Defendant presented the two photocopies of the original composites, and he contended the possible lack of a mustache in the prehypnosis session drawing supported his claim that Bulman was hypnotized during the later interview session and had recalled the mustache while hypnotized. However, as the trial court noted, the defense's proffered prehypnosis composite of the suspect who fired the shotgun had no chin or section under the nose, besides not having a mustache, which supported the prosecutor's explanation that what defendant proffered was merely a bad photocopy. On appeal, defendant contends the procedure of altering the original drawings after the hypnosis session, rather than preserving them for comparison with any posthypnosis session versions, inhibited his ability to establish Bulman was, in fact, hypnotized during the session and recalled the mustache while under hypnosis.

■ Due process requires the state preserve evidence in its possession where it is reasonable to expect the evidence would play a significant role in the defense. (*People v. Beeler* (1995) 9 Cal.4th 953, 976 [39 Cal.Rptr.2d 607, 891 P.2d 153].) The evidence must "possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." (*Trombetta, supra*, 467 U.S. at p. 489.)

As we discussed regarding defendant's motion to dismiss because of precharging delay, his claim that the erased audiotape had exculpatory value is based on speculation that something on it would have contradicted the evidence and testimony tending to show that Agent Bulman was not hypnotized. Similarly, any supposed exculpatory value lost by the failure to preserve the original composite drawings is based on speculation that the mustache was added later, despite the fact that the evidence before the trial court, including testimony of the percipient witnesses, contradicted that claim. Bulman at all times described the shotgun-wielding suspect as having a mustache and attributed the differences in the copies defense counsel showed him to poor photocopying. Bulman's testimony is consistent with the sketch artist's explanation of his procedures and the fact that, if any changes had been made to the original composite sketch on June 6, 1980, they were so minor as to have been joked about after the session. Finally, as the trial court noted, the only evidence in the record was that the presumptive blood tests were inculpatory. Defendant speculates that the swabs and photographs of the results might have contradicted what the analyst reported, but he has

not shown failure to preserve the test results, to the extent possible, resulted in destruction of exculpatory evidence. We agree with the trial court that defendant failed to sustain his burden of proving the threshold requirement that the unavailable evidence had any exculpatory value, and therefore the exculpatory value of these items could not have been apparent before they were "destroyed." As the trial court noted, it appears the failure to preserve these items more likely could have tended to harm the prosecution's case. Because defendant failed to prove the destruction of the items made his trial fundamentally unfair, the failure to preserve them became an issue for the jury to weigh in its decision.

### 4. Denial of Motion to Preclude Agent Bulman's Testimony Because of the Use of Hypnosis

■ Agent Bulman participated in five interviews during which an interviewer tried to hypnotize him in an attempt to obtain new information about the murder. Three sessions occurred in June and July of 1980; two were in May of 1987. In 1982, we concluded in *People v. Shirley* (1982) 31 Cal.3d 18, 23 [181 Cal.Rptr. 243, 723 P.2d 1354] (*Shirley*), that the use of hypnosis for the purpose of "refreshing" a witness's memory generally was not accepted as a reliable practice in the scientific community. We held that, because of the strong likelihood that hypnosis would lead to false memories and an inability effectively to explore the veracity of the witness's recollections upon examination at trial, "the testimony of a witness who has undergone hypnosis for the purpose of restoring his memory of the events in issue is inadmissible as to all matters relating to those events, from the time of the hypnotic session forward." (*Id.* at pp. 66–67.)[11] In 1984, however, the Legislature enacted section 795 of the Evidence Code,[12] which allows the admission of testimony of a witness who has been hypnotized if certain conditions are satisfied. Thereafter, we decided in *People v. Hayes* (1989) 49 Cal.3d 1260 [265 Cal.Rptr. 132, 783 P.2d 719] that a witness who had been hypnotized before January 1, 1985, when section 795 became effective, would be permitted to testify about prehypnotic memories that are found to have been recalled and related to others before the witness was hypnotized, and that the additional requirements section 795 imposed would not be applied retroactively when the witness was hypnotized before its effective date. (*Hayes*, at pp. 1273–1274.)

Pursuant to *Shirley* and *Hayes*, defendant made a motion to preclude Bulman from testifying at trial. In response, the prosecution argued Bulman

---

[11] In *People v. Guerra* (1984) 37 Cal.3d 385, 390 [208 Cal.Rptr. 162, 690 P.2d 635], we made the holding of *Shirley* retroactive to all cases not yet final on the date *Shirley* was decided.

[12] Hereinafter in this part of our opinion, we refer to this provision as section 795.

had not been hypnotized at the sessions, but that, if he had, his testimony was admissible nonetheless. The trial court[13] heard testimony from Bulman, those who attempted to hypnotize him, and prosecution and defense hypnosis experts; it also watched the video recording of the 1987 sessions. In general, Bulman, the officers who tried to hypnotize him in 1980, and the prosecution's expert testified that Bulman was not hypnotized to any meaningful extent during any of the sessions. Dr. Harley Stock, the hypnotist who conducted the 1987 sessions, testified Bulman was in and out of a hypnotic state at various points in the sessions, but Dr. Stock did not believe Bulman's memory of the events could have been affected. Defendant's expert testified Bulman had been hypnotized when he recounted the murder in 1987, and that his memory may have been affected by the hypnosis.

The trial court resolved the conflicting evidence in favor of the prosecution. Finding "there was no hypnosis" of Bulman as that state is "described in *Shirley*," the court suggested that what had happened was "the mere attempt to hypnotize a witness." Noting that experts could not "agree as to what took place" and that it carefully had watched the available tapes and listened to extensive testimony on the issue, the court found "nothing to convince [it] . . . that Agent Bulman was placed . . . in that mental status that *Shirley* is concerned about." With regard to each session, it concluded there "is absolutely no evidence" of "any success in putting Agent Bulman in that state known as hypnosis under *Shirley*."

On appeal, defendant contends the trial court's decision was wrong as a factual matter, the court violated section 795 because it based its decision on an improper legal interpretation of the provision, and its application of the holding of *Hayes*, that section 795 did not apply retroactively to the 1980 hypnosis sessions, violated his right to equal protection of the law under the federal and state Constitutions.[14]

Subdivision (a) of section 795 provides, in part, that "[t]he testimony of a witness is not inadmissible in a criminal proceeding by reason of the fact that the witness has previously undergone hypnosis for the purpose of recalling events that are the subject of the witness's testimony, if all of the following conditions are met . . . ." Subdivision (a)(1) through (4) sets forth conditions on the type of testimony permitted and procedures that must be followed

---

[13] This and subsequent references to the trial court refer to Judge Horan unless otherwise specified.

[14] Defendant did not raise his equal protection claim in the trial court; instead, his own motion to preclude the testimony cited *Hayes* as the controlling authority. The claim therefore is forfeited. In any event, we need not resolve the merits of that claim, or those of his claim that the trial court misinterpreted section 795, because we are convinced that section 795 does not apply in this case.

during the hypnosis session in order for the testimony to be admissible.[15] Subdivision (b) of section 795 provides that "[n]othing in this section shall be construed to limit the ability of a party to attack the credibility of a witness who has undergone hypnosis, or to limit other legal grounds to admit or exclude the testimony of that witness." There is no question that, were it not for the trial court's finding that Bulman had not been hypnotized, Bulman's testimony would be subject to *Shirley* and *Hayes* because, as the trial court noted, a law enforcement officer was present during the sessions, contrary to section 795, subdivision (a)(3)(D).

Defendant contends the trial court erroneously interpreted the term "undergone hypnosis" in section 795, subdivision (a), as requiring that the attempt to hypnotize the witness be successful. This contention is without merit.

█ Section 795 does not, by itself, exclude any evidence. Its plain language makes evidence meeting its requirements "not inadmissible," i.e., it allows the use of evidence that otherwise would be excluded. The use of the double negative is significant. Our decision in *Shirley* prohibited the admission of all future testimony by a witness who had been hypnotized. Section 795's enactment two years later tempered *Shirley*'s effect by allowing some witnesses who had been hypnotized to testify under certain conditions. (*People v. Guerra, supra,* 37 Cal.3d at p. 430, fn. 1 (conc. opn. of Kaus, J.) [§ 795 "modifies *Shirley* by authorizing a witness who has previously undergone hypnosis to testify to matters which the witness recalled and related prior to the hypnosis, so long as a number of specified safeguards are followed"].) It is the holding of *Shirley,* not section 795, that is the basis for excluding a previously hypnotized witness's testimony, a situation somewhat akin to the operation of the hearsay rule and the statutory exceptions to that rule. (See *People v. Alcala* (1992) 4 Cal.4th 742, 773, fn. 10 [15 Cal.Rptr.2d

---

[15] Section 795, subdivision (a)(1) through (4) reads in full: "(1) The testimony is limited to those matters that the witness recalled and related prior to the hypnosis. [¶] (2) The substance of the prehypnotic memory was preserved in a writing, audio recording, or video recording prior to the hypnosis. [¶] (3) The hypnosis was conducted in accordance with all of the following procedures: [¶] (A) A written record was made prior to hypnosis documenting the subject's description of the event, and information that was provided to the hypnotist concerning the subject matter of the hypnosis. [¶] (B) The subject gave informed consent to the hypnosis. [¶] (C) The hypnosis session, including the pre- and post-hypnosis interviews, was video recorded for subsequent review. [¶] (D) The hypnosis was performed by a licensed medical doctor, psychologist, licensed clinical social worker, or a licensed marriage and family therapist experienced in the use of hypnosis and independent of and not in the presence of law enforcement, the prosecution, or the defense. [¶] (4) Prior to admission of the testimony, the court holds a hearing pursuant to Section 402 at which the proponent of the evidence proves by clear and convincing evidence that the hypnosis did not so affect the witness as to render the witness's prehypnosis recollection unreliable or to substantially impair the ability to cross-examine the witness concerning the witness's prehypnosis recollection. At the hearing, each side shall have the right to present expert testimony and to cross-examine witnesses."

432, 842 P.2d 1192] [§ 795 sets forth conditions "which, if met, permit a trial court to determine that the testimony of a previously hypnotized witness is not rendered inadmissible by 'the fact that the witness has previously undergone hypnosis for the purpose of recalling events which are the subject of the witness'[s] testimony' "]; Evid. Code, §§ 1200, subd. (b) [hearsay evidence is inadmissible, except as provided by law], 1220 [an admission of a party "is not made inadmissible by the hearsay rule"].) Defendant's claim on appeal that the trial court misinterpreted section 795 has no relevance here because, having never found that Bulman's testimony was subject to exclusion under *Shirley*, the trial court did not decide whether section 795 nonetheless would permit Bulman to testify. The issue we must decide is whether the trial court's decision conflicts with *Shirley*.

■ Our holding in *Shirley*, that use of hypnosis to "refresh" a witness's memory was not accepted generally as a reliable practice in the scientific community and that a witness who had undergone hypnosis therefore should not be permitted to testify regarding the subject of the hypnosis, rested on the rule for the introduction of scientific evidence set forth in *Frye v. U.S.* (D.C. Cir. 1923) 54 U.S. App.D.C. 46 [293 Fed. 1013]. (*Shirley*, *supra*, 31 Cal.3d at p. 66.) The touchstone of the *Frye* test, and our holding in *Shirley*, is the "reliability" of the proffered scientific evidence. (*People v. Kelly* (1976) 17 Cal.3d 24, 40 [130 Cal.Rptr. 144, 549 P.2d 1240].) When a witness actually has not been hypnotized in any meaningful way, despite attempts to do so, the concerns expressed in *Shirley* regarding reliability of the witness's testimony, namely, introduction of false memories and the tendency for the witness to develop unjustified confidence in recollections, are not at issue. The reliability of such a witness is that of any other witness, and the ensuing testimony similarly would be subject to a credibility attack based on circumstances surrounding the witness's recollections.[16]

The trial court noted that determining whether a witness actually has been hypnotized can be difficult, but it then properly addressed the foundational question whether Bulman had been hypnotized as that state is "described in *Shirley*." It found Bulman never had been hypnotized for purposes of *Shirley*, i.e., he never had been placed in a state of "heightened suggestibility," and therefore he was never questioned about the murder in a state in which false confidence in his recollections or false memories were likely to occur. Defendant disputes the trial court's resolution of the conflicting documentary evidence, lay witness testimony, and expert opinions, but, as with other types

---

[16] Similarly, section 795, subdivision (b) provides that although the testimony of a witness who has been hypnotized in accordance with the requirements of the statute is not inadmissible, the statute does not limit other grounds for challenging the admissibility or credibility of the witness's testimony.

of factual findings, " '[o]n appeal all presumptions favor proper exercise . . .' " of the trial court's power to " 'judge credibility of witnesses, resolve conflicts in testimony, weigh evidence and draw factual inferences' " and its " 'findings—whether express or implied—must be upheld if supported by substantial evidence.' " (*People v. James* (1977) 19 Cal.3d 99, 107 [137 Cal.Rptr. 447, 561 P.2d 1135] (*James*).)

Here, each witness involved in the 1980 sessions testified Bulman never was hypnotized during them; the only contrary evidence consists of somewhat ambiguous statements in written reports of the sessions. Although, as the trial court noted, the destruction of the recordings of those sessions could be viewed as suspicious, we agree with the trial court that any implication arising from this circumstance is insufficient to overcome the evidence that Bulman never was hypnotized as we envisioned that state in *Shirley*.

Evidence concerning the 1987 sessions was closer. Bulman gave conflicting statements about whether he thought he had been hypnotized. He said he did not believe he was hypnotized in a way that affected his memory of the murder, but he thought he may have been hypnotized when, while he concentrated on raising his arm in response to Dr. Stock's suggestions, his arm did rise, and when he had a particularly strong "flashback" of the shotgun being fired at his head. The experts more or less agreed that Bulman was hypnotized to some degree at some point or points during the sessions, especially during the arm raising, but they disagreed about whether Bulman was in an altered mental state when questioned about the murder, such that false memories or false confidence in existing memories might have occurred. Dr. Stock testified first that he did not believe Bulman's memory had been affected, but later stated that Bulman's "state of consciousness" "fluctuated" during questioning about the murder. In Dr. Spiegel's opinion, Bulman was in a very light hypnotic state during the preliminary "induction" stage of the sessions, but was not hypnotized at all when questioned about the murder. Dr. Karlin was of the opinion that Bulman was in a hypnotic state of varying degrees throughout the questioning about the murder. The experts disputed, based on Bulman's extremely low scores on two tests that measure "hypnosis susceptibility," whether, as Dr. Spiegel believed, Bulman psychologically was unable to be hypnotized to any significant degree, or, as Dr. Karlin believed, simply was unwilling to be hypnotized when the tests were conducted.

On appeal defendant essentially claims the evidence supports a finding that Bulman was hypnotized at the 1987 sessions when questioned about the murder, implicating the dangers detailed in *Shirley*. Our role, however, is not to reweigh the evidence, but to determine whether substantial evidence supports the trial court's choices between conflicting evidence and reasonable inferences arising from such evidence. Here, Bulman's testimony, the testimony of those who witnessed the 1980 sessions, and Dr. Spiegel's expert

testimony amply support the trial court's determination that Bulman was not hypnotized within the meaning of *Shirley*. Finding substantial evidence supports the trial court's decision, we uphold it on appeal. (*James, supra,* 19 Cal.3d at p. 107.) Accordingly, we conclude the trial court did not err by permitting Agent Bulman to testify.

> 5. *Denial of Motion to Dismiss Due to Prosecution's Interception of Conversation Involving Defendant, Defendant's Mother, and a Defense Investigator*

Defendant contends the monitoring and recording of a telephone call involving himself, his mother, and a defense investigator violated his state statutory rights and his state and federal constitutional rights. We perceive defendant as raising five distinct possible grounds for claims of error: (1) a statutory violation of Evidence Code section 954, the attorney-client privilege; (2) a violation of his federal Sixth Amendment right to counsel; (3) a violation of his federal Fifth Amendment due process right to a fair trial; (4) a violation of his federal Fifth Amendment right to substantive due process; and (5) a violation of his state constitutional right to counsel. After setting forth the factual background, we address each ground in turn.

Before jury selection began, the prosecution obtained a warrant authorizing law enforcement agents to monitor and record conversations from several telephones, including the one at the home of defendant's parents. The warrant's justifications were to attempt to prevent intimidation or dissuasion of witnesses in defendant's case and, to the extent any conversations concerning attempts to influence witnesses might be intercepted, to bolster the prosecution's case against defendant by demonstrating his consciousness of guilt. (See CALJIC No. 2.06; CALCRIM No. 371.) During jury selection, after the wiretap operation had ended and the prosecution had provided the defense transcripts of the intercepted calls, defendant moved to dismiss the charges based on the prosecution's having intercepted and recorded a call involving himself, his mother, and a defense investigator. During that call, several subjects concerning the trial were discussed, including potential defense witnesses and how the defense might respond to the prosecution's evidence.[17]

---

[17] The call was between defendant and his mother until defendant asked her to initiate a three-way call by calling the defense investigator. During the subsequent conversation, they mentioned the following subjects: (1) locating a potential witness, Tim Crayton, who was incarcerated under a different name, which they were unsure of, and obtaining his rap sheet; (2) plans to subpoena school records to confirm whether defendant and Detective Henry attended the same high school at the same time; (3) a desire to locate a witness named Donna Hall, who had an alias and who might be able to help find another witness, Barbara Maroney; (4) plans for an investigator to talk to a "Chuckie," and that defendant suspected the prosecution had taken witness "Patricia Ann" off the witness list to save for rebuttal because

The prosecution argued the call was not privileged due to the participation of defendant's mother, but that, in any event, the charges should not be dismissed because the prosecution gained no advantage from the intercepted call, as shown by declarations of the prosecutors and law clerks working on the case stating that they never read the transcript of the call. The trial court sealed that transcript and continued the hearing on the motion until after trial;[18] after the penalty phase verdict, it unsealed the transcript over defendant's objection.

On the date of sentencing, the trial court heard testimony regarding the motion from defendant, Detective Henry, and Gene Salvino, the district attorney's investigator who recorded the call. Henry testified he supervised the wiretap operation and was present when the call was intercepted. During the call, he sought advice from the district attorney's office concerning whether it should be monitored and recorded, and, for the first time during the wiretap operation, attorneys from that office told Henry he should be "careful" about intercepting any call in which trial strategy was discussed.[19] The next day, Henry sought similar advice from the judge who issued the warrant, who told Henry he "should probably be concerned" with intercepting calls involving defense investigators.[20] Henry then decided to "minimize" all calls involving defense investigators, meaning the recording apparatus was turned off once the person monitoring the call determined a defense investigator was participating. Henry made this decision because he doubted he

someone would be talking to "Chuckie," who might know about a conspiracy between "Patricia Ann," "Tiny," and Detective Henry; (5) the fact that "Chuckie" and others claimed defendant was "running" with Terry Brock, but they actually had not seen them together, and the existence of police reports stating that defendant was "on the outs with him at that time"; (6) the importance of "Cheryl's" testimony from the triple murder case, that she did not see Terry "after Howard's incident," because "they need to try to hook me to Terry Brock"; (7) getting defendant a copy of a court order concerning his in propria persona status; and (8) their belief that "Cleotis" was lying "about we was doing all this stuff together" because Tim Crayton was in prison, and defendant "never did nothing with Cleotis in the first place." The conversation was mainly between defendant and the investigator, but defendant's mother participated at several points. The discussion of these subjects was for the most part brief and superficial; the most in-depth part of the call concerned various possible spellings of Crayton's assumed name.

[18] The trial court denied defendant's motion to dismiss the charges based on the interception of two other calls involving only the defense investigator and defendant's mother on the basis that those conversations were not privileged. Defendant does not challenge that determination on appeal.

[19] Detective Henry also testified that, in a training session before the wiretaps were in effect, he specifically asked the attorney from the district attorney's office who was at the session whether a three-way conversation between defendant, a defense investigator, and a third party would be privileged. The attorney told Henry such a call would not be privileged.

[20] Contrary to defendant's assertion on appeal, there is no evidence in the record that the judge "confirmed" that interception of the call at issue was, in fact, improper because it was privileged.

adequately could explain to those involved in the wiretap operation, most of whom did not know the particulars of defendant's case, how to determine whether a particular call involved trial strategy. All such calls were minimized for the remainder of the operation.

Henry testified he heard parts of the intercepted conversation while seeking legal advice, and he most likely later read the investigator's log summarizing it. He could not recall whether he listened to the tape of the call near the time it was recorded; he did listen to it after the trial to prepare for the hearing on the motion to dismiss. Both Henry and investigator Salvino testified they never communicated the call's contents to anyone on the prosecution team. The trial court asked Henry, "And in terms of the information contained in Exhibit A, did you make any attempt to exploit or profit from that information and investigate the people mentioned in [it]?" Henry responded, "I had interviewed most of the people that I heard on these conversations prior to this conversation, but nothing related to this conversation." Henry added that he did not use anything he heard to investigate people mentioned in the call.

Stating it was giving defendant the benefit of the doubt, the trial court found defendant had made a "prima facie showing" that the call was a privileged communication under Evidence Code section 952. The court reasoned that, because defendant's mother participated in the call to further his interests, her presence did not destroy the confidentiality of the conversation.[21] The court, however, then denied the motion to dismiss because the evidence demonstrated that the interception of the call did not prejudice defendant or benefit the prosecution. The court observed that Detective Henry was confronted with an "unusual situation" when he had to decide whether to monitor and record the call and, to the extent his choice to record it interfered with defendant's attorney-client privilege, this was not "egregious conduct" on the part of the prosecution. The court credited the prosecution team's statements, including those of Henry, that the prosecution made no use of any information disclosed in the call. The court also observed that, immediately after that call, defendant's mother in subsequent, clearly nonprivileged calls to people not part of the defense team repeated "almost verbatim" the

---

[21] At the time of defendant's trial, Evidence Code former section 952 provided: "As used in this article [concerning the attorney-client privilege], 'confidential communication between client and lawyer' means information transmitted between a client and his or her lawyer in the course of that relationship and in confidence by a means which, so far as the client is aware, discloses the information to no third persons other than those who are present to further the interest of the client in the consultation or those to whom disclosure is reasonably necessary for the transmission of the information or the accomplishment of the purpose for which the lawyer is consulted, and includes a legal opinion formed and the advice given by the lawyer in the course of that relationship. A communication between a client and his or her lawyer is not deemed lacking in confidentiality solely because the communication is transmitted by facsimile, cellular telephone, or other electronic means between the client and his or her lawyer." (Evid. Code, former § 952, as amended by Stats. 1994, ch. 587, § 9, p. 2915.)

information conveyed in the call at issue. The court gave "zero weight" to defense counsel's unsupported statement in his declaration that the interception of the call prevented counsel from proceeding with the planned defense. Accordingly, the trial court concluded interception of the call was "at best," a "technical violation of the attorney/client relationship, not exploited, not undertaken in bad faith, . . . and [it] could not have had any bearing on the outcome of this trial."

Assuming arguendo the three-way call was a confidential communication as defined in section 952 of the Evidence Code (see *People v. Meredith* (1981) 29 Cal.3d 682, 690, fn. 3 [175 Cal.Rptr. 612, 631 P.2d 46]), we conclude the record does not support a claim that defendant's statutory rights under the attorney-client privilege were violated. Defendant has made no showing that any witness disclosed any information from the call during the proceedings in violation of Evidence Code section 954.[22] Indeed, substantial evidence supports the trial court's findings that the call's contents were not disclosed to the prosecutors. Although we acknowledge, as defendant points out, that Henry's testimony was not as clear as it might have been in resolving whether he utilized *any* information he learned from the call in *any* manner, when we view the testimony in context, and in light of the absence of any contrary evidence, we conclude that substantial evidence also supports the trial court's findings that "there is no testimony or no suggestion that anybody profited from any of the information contained in" the call, and that "[i]t does not appear to me that there was any attempt by the officer . . . to profit from that situation or to exploit it." Defendant's speculation that Henry's trial testimony might in some way have been affected by what he might have learned from the call, with no specific allegation of how the record supports such a claim, does not demonstrate that Henry's testimony improperly disclosed privileged information learned from the call.

■ As to the possibility that defendant's Sixth Amendment right to counsel was violated, defendant contends interception of the call "deprived [him] of his right to privileged communication with his attorney as well as his constitutional right to counsel." To some degree, this argument is based on the unsupported premise that there is a federal constitutional privilege that protects confidential communications between a defendant and his attorney. No federal constitutional provision, however, establishes an attorney-client communication privilege. Rather, the Sixth Amendment guarantees a criminal defendant the right to "assistance of counsel for his defense." (U.S. Const., 6th Amend.) Confidential communication between a defendant and his lawyer

---

[22] Section 954 of the Evidence Code provides, in part, that "[s]ubject to Section 912 [(addressing waiver of a privilege)] and except as otherwise provided in this article, the client, whether or not a party, has a privilege to refuse to disclose, and to prevent another from disclosing, a confidential communication between client and lawyer . . . ."

is itself not a separate "right" that the federal Constitution guarantees, but rather an aspect of ensuring fulfillment of the right to assistance of counsel.

As the United States Supreme Court has explained, the right to the assistance of counsel is violated either by (1) the complete denial of counsel or its equivalent, or (2) the denial of the effective assistance of counsel. (*United States v. Cronic* (1984) 466 U.S. 648, 659 [80 L.Ed.2d 657, 104 S.Ct. 2039] (*Cronic*); *Strickland v. Washington* (1984) 466 U.S. 668 [80 L.Ed.2d 674, 104 S.Ct. 2052]; *McMann v. Richardson* (1970) 397 U.S. 759, 771, fn. 14 [25 L.Ed.2d 763, 90 S.Ct. 1441].) As the high court noted in *Strickland*, typically, a defendant claiming a violation of the federal constitutional right to effective assistance of counsel must satisfy a two-pronged showing: that counsel's performance was deficient, and that the defendant was prejudiced, that is, there is a reasonable probability the outcome would have been different were it not for the deficient performance. (*Strickland, supra*, 466 U.S. at p. 687.) In contrast, a defendant is spared "the need of showing probable effect upon the outcome . . . where assistance of counsel has been denied entirely or during a critical stage of the proceeding . . . the likelihood that the verdict is unreliable is so high that a case-by-case inquiry is unnecessary. [Citations.] But only in 'circumstances of that magnitude' do we forgo individual inquiry into whether counsel's inadequate performance undermined the reliability of the verdict." (*Mickens v. Taylor* (2002) 535 U.S. 162, 166 [152 L.Ed.2d 291, 122 S.Ct. 1237]; see also *Cronic, supra*, 466 U.S. at p. 659 & fn. 25 [no showing of prejudice is required when counsel is "totally absent, or prevented from assisting the accused during a critical stage of the proceeding," or "fails to subject the prosecution's case to meaningful adversarial testing"].)

To the extent defendant contends interception of the conversation between him and an agent of his attorney constitutes a "circumstance of [the] magnitude" of the complete denial of counsel that alone is sufficient to establish a denial of his federal right to counsel, he is mistaken. In *Weatherford v. Bursey* (1977) 429 U.S. 545, 549 [51 L.Ed.2d 30, 97 S.Ct. 837] (*Weatherford*) the Supreme Court rejected a per se rule that " 'whenever the prosecution knowingly arranges or permits intrusion into the attorney-client relationship the right to counsel is sufficiently endangered to require reversal and a new trial.' " Although the high court did not establish a definitive standard for determining when surreptitious state participation in communications between a defendant and his or her attorney or, as here, the attorney's agent, *does* violate the Sixth Amendment, it stated that unless the record supports "at least a realistic possibility of injury to [the defendant] or benefit to the State, there can be no Sixth Amendment violation." (*Weatherford*, at p. 558; see also *Cronic, supra*, 466 U.S. at p. 658 ["Absent some effect of challenged conduct on the reliability of the trial process, the Sixth Amendment guarantee is generally not implicated."].) In other words, a court properly

rejects a Sixth Amendment claim based on surreptitious state participation in communications between a defendant and his or her attorney or the attorney's agent when the record demonstrates there was no realistic possibility of injury to the defendant or benefit to the prosecution.[23]

Here, the trial court essentially found there was no realistic possibility of injury to defendant or benefit to the state and therefore there was no violation of defendant's Sixth Amendment right to counsel. We conclude that ruling was correct. Although the factual contexts of this case and *Weatherford* are different (this case involved a secret wiretap, that case an undercover officer), the critical facts are comparable in all important respects. In both cases a law enforcement officer who was assisting in the investigation of the defendant's offenses, and who testified at the defendant's trial, became privy to trial strategy discussions between the defendant and the defense attorney or the attorney's agent. In both, the record supported the findings that the information the officer learned was not conveyed to the prosecutors and that the officer's investigation or testimony at trial was not affected by information learned during the discussions. (*Weatherford, supra,* 429 U.S. at pp. 547–549, 555.) At no point during the trial, the hearing on the motion to dismiss, or this appeal has defendant identified any specific evidence that the prosecution offered that he suspects was developed as a result of the intercepted call. As in *Weatherford,* we find no grounds to believe "federal or state prosecutors will be so prone to lie or the difficulties of proof will be so great that we must always assume not only that an informant communicates what he learns from an encounter with the defendant and his counsel but also that what he communicates has the potential for detriment to the defendant or benefit to the prosecutor's case." (*Id.* at pp. 556–557.)

That defendant's mother repeated to others much of what was discussed during the three-way call, and that Detective Henry, and even the prosecutors,

---

[23] We are aware of no decision by the high court in the intervening years that has answered the questions left unresolved in *Weatherford*—what showing of injury to the defendant or benefit to the state is, *in the affirmative,* required to prove a Sixth Amendment violation, and who bears the burden of persuasion. (See *Cutillo v. Cinelli* (1988) 485 U.S. 1037 [99 L.Ed.2d 915, 108 S.Ct. 1600] (dis. of White, J., from denial of petn. for cert.) [noting a three-way split of authority in the federal courts of appeals]; *People v. Ervine* (2009) 47 Cal.4th 745, 766–767 [102 Cal.Rptr.3d 786, 220 P.3d 820] (*Ervine*).) Defendant cites our decision in *People v. Zapien* (1993) 4 Cal.4th 929 [17 Cal.Rptr.2d 122, 846 P.2d 704] as having adopted the view that once a defendant has made a preliminary showing of state interference with the attorney-client relationship, the burden then falls on the prosecution to prove the absence of prejudice. (See also *Morrow v. Superior Court* (1994) 30 Cal.App.4th 1252, 1258 [36 Cal.Rptr.2d 210], quoting *Zapien, supra,* 4 Cal.4th at p. 967.) As we explained in *Ervine,* however, in *Zapien* we "had no occasion to consider . . . who would bear the burden of proving or disproving prejudice and how that burden might be satisfied where a defendant claimed a violation of the right to counsel due to an invasion of the attorney-client relationship." (*Ervine, supra,* 47 Cal.4th at p. 769, fn. 11.)

therefore would have learned much of its contents even if it had been minimized, further decreases any possibility that interception of the call hindered the defense or benefited the prosecution. Even to the extent defendant is correct that the trial court's finding that the mother repeated the contents of the call "almost verbatim" in later nonprivileged calls overstates the extent to which she disclosed the substance of the conversation at issue, defendant identifies no specific items that were *not* repeated that were, or even could have been, particularly helpful to the prosecution, and we discern none from our reading of the record.

Defendant not only failed to point to any evidence of a benefit to the prosecution from the intercepted call; he has made no attempt to refute the trial court's finding that defense counsel's conclusory statement in his declaration that the interception affected the choice of the defense presented at trial was entitled to "zero weight." We also observe that, by the time the defense learned of the wiretaps and interception of the three-way call, the warrant had expired, and the defense would have been aware that even when the warrant was in effect, all calls involving defendant and his attorneys and investigators (other than the one at issue) had been minimized. Defendant, who testified at the hearing on the motion to dismiss, did not claim his ability to communicate with his attorneys or investigators was negatively affected after he learned of the wiretap operation. (See *Ervine, supra,* 47 Cal.4th at p. 769 ["a defendant's inability to consult with counsel or to assist in his defense must appear in the record"].)

We also conclude that, as in *Weatherford,* the present case "is not a situation where the State's purpose was to learn what it could about the defendant's defense plans." (*Weatherford, supra,* 429 U.S. at p. 557.) The monitoring and recording of the three-way call was pursuant to a warrant authorizing interception of calls emanating from defendant's parents' telephone for the purpose of gathering evidence concerning attempts to intimidate and dissuade witnesses who might testify against defendant. Defendant does not challenge on appeal the validity of that warrant. (Cf. *Weatherford, supra,* 429 U.S. at pp. 551–554 [distinguishing the high court's earlier cases involving law enforcement's surreptitious participation in attorney-client communications that also constituted violations of the defendants' 4th Amend. rights].) There is no evidence the purpose of the wiretap in this case was to attempt to learn defense strategy, and the record contradicts such an assertion. Detective Henry testified that directions to minimize all calls involving a defense attorney, as well as all calls involving only defendant and an investigator, were in effect for the entire wiretap operation, and that immediately after the call at issue, *all* calls involving a defense investigator, including those in which a third person participated, were minimized. Henry's decision to continue recording the call at issue (the first of its kind during the operation) while seeking to confirm his understanding that doing so would

not violate defendant's attorney-client privilege does not show that the purpose of recording that call had changed to an attempt to gain knowledge of the defense plans, as opposed to obtaining potential evidence of intimidation or dissuasion of witnesses. Contrary to defendant's arguments, the fact that Henry at some point read the log summary of the call, as he did with every call, and may have listened to the recording, does not show that his purpose in doing so was to learn defense trial strategy rather than to determine whether the call, parts of which involved only defendant and his mother and therefore were not privileged, had evidentiary value.[24]

For these reasons, the record demonstrates no realistic possibility that defendant was injured by, or the prosecution benefited from, the monitoring and recording of the three-way call. Accordingly, defendant's Sixth Amendment right to counsel could not have been violated.[25]

■ To the extent defendant contends the monitoring and recording of the call violated his due process right to a fair trial under the Fifth Amendment to the federal Constitution, we are not convinced. For much the same reasons as we concluded his Sixth Amendment right to counsel was not violated, we conclude the interception of the call did not make defendant's trial fundamentally unfair. Assuming a due process violation could, in an appropriate case, be grounded on the prosecution's secretly learning defense evidence and strategy beyond that which the discovery statutes may compel the defense to disclose, interception of the call at issue in this case could not have upset the "balance of forces between the accused and his accuser" to a degree that denied defendant any constitutional right to reciprocity of discovery. (*Wardius v. Oregon* (1973) 412 U.S. 470, 474, 476 [37 L.Ed.2d 82, 93 S.Ct. 2208] ["It is fundamentally unfair to require a defendant to divulge the details of his own case while at the same time subjecting him to the hazard of surprise concerning refutation of the very pieces of evidence which he disclosed to the State."]; *Weatherford, supra*, 429 U.S. at p. 562 (dis. opn. of Marshall, J.) ["the fairness of trials is undermined when the prosecution surreptitiously acquires information concerning the defense strategy and evidence (or lack of it), the defendant, or the defense counsel"].) As discussed above, there has been no showing that (1) the purpose of intercepting the call

---

[24] We also observe that, as previously noted, the record contains no evidence that Detective Henry ever received a definitive legal opinion that the three-way call was privileged and therefore should not have been reviewed.

[25] Because we conclude there has been no showing of a realistic possibility of harm to defendant or benefit to the prosecution and that defendant's Sixth Amendment right to counsel was not violated, we do not decide, when the record of a particular case establishes a realistic possibility of harm or benefit, what evidence would establish a Sixth Amendment violation, whether the prosecution may attempt to disprove a violation by demonstrating that no harm or benefit actually occurred, or what remedy, e.g., retrial or dismissal of the charges with or without prejudice, is appropriate if a violation of this type is established.

was to discover defense strategy, (2) information in it was communicated to the prosecutors, or (3) law enforcement agents utilized, or even could have utilized, information conveyed in the call. In addition, defendant's mother disclosed most of the same information to others in properly intercepted calls, and, as the trial court noted, defendant made no showing that the witnesses discussed in the call "were ever found, what the witnesses would have said had they been found and how in the world that impacted upon the defense in this case." Interception of the three-way call did not force defendant to divulge details of his own case while subjecting him to the hazard of surprise refutation of that evidence, did not compel him to be a witness against himself, and did not otherwise make the trial fundamentally unfair.

 Defendant complains of what he characterizes as the "egregious" nature of the authorities' actions in intercepting the apparently privileged call. To the extent he claims the allegedly egregious actions violated his right to substantive due process under *Rochin v. California* (1952) 342 U.S. 165 [96 L.Ed. 183, 72 S.Ct. 205] and its progeny, his contention is without merit. Arbitrary official action can violate a defendant's substantive due process rights, but "only the most egregious official conduct can be said to be 'arbitrary in the constitutional sense . . . .' " (*County of Sacramento v. Lewis* (1998) 523 U.S. 833, 846 [140 L.Ed.2d 1043, 118 S.Ct. 1708] (*Lewis*).) The high court described the required level of egregiousness as "that which shocks the conscience," but it has recognized that courts cannot apply a "calibrated yard stick" in assessing whether challenged official action shocks the conscience. (*Id.* at pp. 846–847.) We easily conclude the challenged actions here were not so egregious as to shock the conscience such that the conduct was arbitrary in the constitutional sense. The call at issue was intercepted pursuant to a judicially approved warrant authorizing the monitoring and recording of calls on that phone line. Before the wiretap operation began, Detective Henry, anticipating that three-way calls involving defendant, members of the defense team, and third parties might occur, asked for legal advice concerning whether such calls should be treated as privileged. Even if that initial advice was incorrect or too general, there is no reason to believe Henry knew the advice was deficient, or that the attorney purposefully gave him bad advice. While the three-way call was occurring, Henry sought to confirm what he had been told concerning whether it was permissible to monitor and record the call. Once he received the new advice, Henry took an arguably overly cautious approach, rather than risk an invasion of defendant's privilege. Further, no evidence establishes that Henry tried to exploit any information conveyed in the call either by sharing it with the prosecutors or utilizing it in his own investigation or testimony.

The record demonstrates that the interception of the call at issue, if improper at all in a constitutional sense,[26] was the result of negligence in interpreting the privilege statute in the heat of the moment. As the high court has stated, however, "liability for negligently inflicted harm is categorically beneath the threshold of constitutional due process." (*Lewis, supra,* 523 U.S. at p. 849.) It is only "behavior at the other end of the culpability spectrum that would most probably support a substantive due process claim; conduct intended to injure in some way unjustifiable by any government interest is the sort of official action most likely to rise to the conscience-shocking level." (*Ibid.*) Because there is no evidence of an unjustifiable intent to harm defendant by invading his attorney-client privilege, we conclude his substantive due process rights were not violated.

Finally, we address any claim defendant may have raised that his right to counsel under article I, section 15 of our state Constitution was violated. Defendant cites our decision in *Barber v. Municipal Court* (1979) 24 Cal.3d 742 [157 Cal.Rptr. 658, 598 P.2d 818] (*Barber*), in which we considered, as a matter of California constitutional law, "what is the proper remedy for an accused when his constitutional right to counsel has been denied by the actions of an undercover police officer who poses as a codefendant and attends the confidential attorney-client conferences of the accused." (*Id.* at p. 745.) Addressing that issue, we stated, "The right to counsel, which embodies the right to private consultation with counsel, is violated when a state agent is present at confidential attorney-client conferences." (*Id.* at p. 752; see also *In re Johnson* (1979) 24 Cal.3d 769, 771 [157 Cal.Rptr. 674, 598 P.2d 834] [*Barber* held "the surreptitious invasion of confidential attorney-client meetings by an agent of the state denied an accused his right to counsel"].) Having concluded in *Barber* that the defendants' right to counsel had been violated in this manner, we also rejected an exclusionary remedy that would have simply sought to eliminate any benefit the prosecution gained from the violation, and concluded the only appropriate remedy was dismissal of the charges. (*Barber, supra,* 24 Cal.3d at pp. 756–759.) To the extent defendant contends *Barber* warrants the reversal of the judgment and dismissal of the charges in his case, we disagree. *Barber* is distinguishable. (See, e.g., *Ervine, supra,* 47 Cal.4th at pp. 769–770 [discussing and distinguishing *Barber*].)

---

[26] It is unclear how, as a federal constitutional matter, the question of the propriety of intercepting the three-way call would be resolved. It appears the interception would have been contrary to the *statutory* attorney-client privilege if any gained information had been used at the trial. On the other hand, the call was intercepted pursuant to a judicially approved warrant, the validity of which defendant does not challenge. In addition, as we have explained, *ante,* defendant has not established that interception of the call violated his Sixth Amendment right to counsel. One might question whether only a potential violation of state law, by itself, could amount to egregious misconduct for federal constitutional purposes.

The prosecution in *Barber* arose from a "sit-in" protest at a nuclear power station, during which many protesters were arrested and charged with trespassing. Unbeknownst to the protesters, two of their group were undercover police officers who had participated on behalf of the local law enforcement authorities in planning and executing the protest. When the defendants ultimately learned that an officer, who continued his undercover activities after the arrests, had actively participated in a number of defense strategy meetings, they moved to dismiss the charges. The trial court denied the motion, and defendants sought a pretrial writ of prohibition. The testimony at the hearing on the motion to dismiss was as follows.

After the arrests, the protesters chose group representation by two attorneys. One undercover officer dropped out of the group, but the other remained in his undercover capacity. The prosecutor was aware a police officer was in the group, but did not inform defense counsel. The officer attended meetings between the defendants and their attorneys at which defense strategy was discussed. He also prepared a map of the protest site for the defense attorneys, but it omitted an opened gate in the area that may have been crucial in defending against the trespassing charges. The officer testified he did not intentionally omit the gate from the map. He contended that, although the meetings with the attorneys discussed the case and defense strategies in detail, he participated only in general discussions about the case. (*Barber, supra,* 24 Cal.3d at pp. 745–748.) While involved in these activities, the officer was reporting to his superiors. His reports were almost all oral; he filed only one written report during the two months at issue. The superiors testified the officer provided no information about defense strategy, but the officer testified that at one point he told his superiors "the defense was to become more 'political.' " (*Id.* at p. 749.)

Eventually, the trial court informed defense counsel that one of the defendants was an undercover police officer. The defense attorney testified that when the remaining defendants learned of this fact, they became excessively suspicious and, in contrast to their earlier behavior, reluctant to discuss the case with counsel and distrustful of each other and the defense team. (*Barber, supra,* 24 Cal.3d at pp. 749–750.)

The trial court denied the motion to dismiss based on its finding that the officer shared nothing that he learned at the meetings with the prosecutors. The court ordered that the prosecution could use no evidence obtained by the officer, and could present no evidence without proving beyond a reasonable doubt that it was not derived from the officer's activities. (*Barber, supra,* 24 Cal.3d at p. 750.) We granted relief, however, concluding that the defendants' right to counsel had been violated, and that the trial court's exclusionary remedy was insufficient. (*Id.* at pp. 752–759.)

The circumstances of *Barber* are quite different from those in the present case. As noted above, the officer in *Barber* participated in many meetings during which defense strategy was thoroughly discussed; he conveyed, to some degree, the nature of the anticipated defense with his superiors; and he inserted himself directly into the defense preparations by volunteering to draw the map of the area, which, suspiciously, omitted a key feature likely to have been helpful to the defense. All of this occurred because the officer, with the knowledge of the prosecution, deceived the defendants and their attorneys concerning his true status. (See *Barber, supra,* 24 Cal.3d at p. 754, fn. 12 [effect of an officer participating in the defense is not the same as a codefendant cooperating with authorities because "it is one thing for an individual to be 'betrayed' by an acquaintance or a private person with whom he has associated[;] [i]t is another for the government deliberately to send out agents to do to its citizens by trickery what it may not do to them directly"].) In addition, there was evidence that the defendants "[had] been prejudiced in their ability to prepare their defense" after they learned an undercover officer had been in their midst. (*Id.* at p. 756.)

Here, detectives intercepted one telephone call between defendant and a defense investigator that covered only limited topics related to certain witnesses, and the interception occurred pursuant to a judicially approved warrant, not "trickery" by the authorities. There was no evidence anyone other than the officers monitoring the call learned of its contents, and much of what was discussed in that call was repeated in subsequent calls that were not privileged. One might question whether the circumstances in the present case warrant a conclusion that defendant's state constitutional right to counsel was violated, notwithstanding broad language used in the much more egregious circumstances of *Barber* that suggests it is invariably the case that "[t]he right to counsel, which embodies the right to private consultation with counsel, is violated when a state agent is present at confidential attorney-client conferences." (*Barber, supra,* 24 Cal.3d at p. 752.)[27] We need not decide in this case whether *Barber*'s statement of the rule should be interpreted more narrowly in light of its facts, however, because, even assuming defendant's state constitutional right to counsel was violated, we conclude reversal of the judgment is not warranted.

---

[27] In *Barber,* we refuted the state's reliance on *Weatherford* in arguing that no violation of the right to counsel occurred by distinguishing that case on its facts (in addition to stating that, as *Weatherford* dealt with the federal right to counsel, it was inapposite). (*Barber, supra,* 24 Cal.3d at pp. 754–755.) However, as we discuss, *ante,* in analyzing whether defendant's federal right to counsel was violated, the important factual circumstances here are essentially indistinguishable from those of *Weatherford.* (See also *In re Martin* (1987) 44 Cal.3d 1, 55 [241 Cal.Rptr. 263, 744 P.2d 374] [concluding, under the facts of that case, *Barber* "is inapposite: in [*Barber*], a governmental agent's intrusion by trickery into confidential attorney-client conferences justified dismissal; in this case, no such—or even similar—intrusion appears"].)

We first point out that *Barber* involved an application for a pretrial writ of prohibition, while the present case is an appeal from a judgment of conviction and sentence. As such, this case is subject to article VI, section 13 of the California Constitution, which provides: "No judgment shall be set aside, or new trial granted, in any cause, on the ground of misdirection of the jury, or of the improper admission or rejection of evidence, or for any error as to any matter of pleading, or for any error as to any matter of procedure, unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice." This provision mandates that, typically, a defendant having proved error must further establish there exists a reasonable probability he or she would have obtained a more favorable outcome in the trial of guilt or innocence were it not for the error. (*People v. Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243] (*Watson*) ["a 'miscarriage of justice' should be declared only when the court, 'after an examination of the entire cause, including the evidence,' is of the 'opinion' that it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error"].) In *Barber*, because we were not considering the reversal of a judgment, we had no occasion to consider whether a violation of the state right to counsel resulting from an invasion of the attorney-client relationship can be considered a "miscarriage of justice" without a showing of prejudice to the outcome of the trial. Although we have acknowledged that some errors may rise to the level of a miscarriage of justice without regard to the strength of the evidence presented at trial (*People v. Cahill* (1993) 5 Cal.4th 478, 501 [20 Cal.Rptr.2d 582, 853 P.2d 1037] (*Cahill*)), the facts in this case do not involve such an error.[28]

"[T]he kinds of errors that, regardless of the evidence, may result in a 'miscarriage of justice' because they operate to deny a criminal defendant the constitutionally required 'orderly legal procedure' (or, in other words, a fair trial)—for example, the denial of the defendant's right to a jury trial or to an impartial trial judge [citation]—all involve fundamental 'structural defects' in the judicial proceedings, analogous to those to which the United States Supreme Court referred in its [*Arizona v. Fulminante* (1991) 499 U.S. 279 [113 L.Ed.2d 302, 111 S.Ct. 1246]] decision . . . ." (*Cahill, supra*, 5 Cal.4th at pp. 501–502.) The assumed violation of the right to counsel at issue here is not such a "structural defect." Defendant had counsel, and his attorney vigorously pursued his interests throughout the trial. (See *Neder v. United States* (1999) 527 U.S. 1, 8 [144 L.Ed.2d 35, 119 S.Ct. 1827] [" '[M]ost constitutional errors can be harmless.' [Citation.] '[I]f the defendant had

---

[28] We need not, and do not, decide whether in some other case a violation of the right to counsel resulting from government interference with the attorney-client relationship could be considered a miscarriage of justice without requiring the defendant to establish a reasonable probability of a more favorable outcome.

counsel and was tried by an impartial adjudicator, there is a strong presumption that any other [constitutional] errors that may have occurred are subject to harmless-error analysis.' "].) As the trial court found, there is no evidence that the interception of the call benefited the prosecution or negatively affected the presentation of the defense. We therefore cannot conclude that counsel's performance was affected to such a degree that it was as though defendant was denied counsel. (Cf. *ibid.* [the complete denial of counsel in violation of *Gideon v. Wainwright* (1963) 372 U.S. 335 [9 L.Ed.2d 799, 83 S.Ct. 792] is structural error].) Nor can we say that, because of the interception of the call defendant's trial could not "reliably serve its function as a vehicle for determination of guilt or innocence." (*Rose v. Clark* (1986) 478 U.S. 570, 577–578 [92 L.Ed.2d 460, 106 S.Ct. 3101].) Accordingly, we conclude the assumed violation of the right to counsel in this case is not an error that by itself constitutes a miscarriage of justice, without consideration of the error's impact on the outcome of the case. (Cf. *United States v. Morrison* (1981) 449 U.S. 361, 365 [66 L.Ed.2d 564, 101 S.Ct. 665] ["[A]bsent demonstrable prejudice, or substantial threat thereof, dismissal of the indictment [under the Sixth Amendment] is plainly inappropriate, even though the violation [(an invasion of the attorney-client relationship)] may have been deliberate." (Fn. omitted.)].)

To the extent defendant draws on our discussion of the adequacy of an exclusionary remedy for the violation in *Barber* in lieu of outright dismissal of the charges as support for an assertion that the violation in the present case was itself a miscarriage of justice, his argument is not persuasive. No concern that led to our conclusion that dismissal was required in *Barber* is present in this case.

In *Barber*, the evidence established that the violation of the right to counsel negatively affected the defense, in that the defendants came to mistrust their attorneys and refused to cooperate with them as a result of the officer's infiltration into their group. As a result, the attorneys were unable to prepare adequately for trial. (*Barber, supra,* 24 Cal.3d at p. 750.) Here, there is no evidence the defense was impaired, other than counsel's unsupported, conclusory statement in his declaration, which the trial court reasonably accorded "zero weight."

In addition, given the circumstances of the violation in *Barber*, it would have been particularly difficult for the defendants to prove prejudice, because there was essentially no written record of what the officer learned as a participant in the defense meetings, what information he conveyed to his superiors, and what information he or his superiors could have conveyed to the prosecutors, if their testimony that they had not passed on information was untruthful. All but one of the officer's reports were oral, there was a

possibility he actively had tried to sabotage the defense by creating an erroneous map, and even among the prosecution's witnesses there was uncertainty regarding what aspects of the defense strategy, if any, the officer actually conveyed to his superiors. Here, there was a record of everything Detective Henry could have learned from the interception of the three-way call, and there was no inconsistency concerning whether anyone other than Henry and the other monitoring officer gained any information from that call.

Furthermore, because the content of that intercepted call was transcribed, we need not rely solely on the officers' and prosecutors' assurances that the information was not used at trial. In contrast, in *Barber*, the undercover officer was privy to all of the defense planning, and thus there were myriad ways in which the officer or prosecutor could have used the information that the officer learned. Here, with the much more narrow universe of information at issue, defendant reasonably could be expected to point out specific instances in the trial record where he at least suspects that the prosecution or a witness utilized information gained from the three-way call, and to explain how the use of any such information might have affected the outcome of the trial. (Cf. *People v. Towler* (1982) 31 Cal.3d 105, 122–123 [181 Cal.Rptr. 391, 641 P.2d 1253] (*Towler*) [noting the record was inadequate to determine whether dismissal of the charges would be an appropriate remedy for a violation of the right to counsel arising from the seizure of a legal document from the defendant's jail cell because "unlike the situation in *Barber*, here it might have been readily apparent from an examination of the document whether or not the prosecution was actually aided by the information and whether some remedy short of dismissal would be adequate to protect defendant's rights"].)

Similarly, the "Catch-22" we acknowledged in *Barber*—that a remedy of merely excluding affected evidence would be illusory in that particular case because requiring a determination whether the prosecution's evidence was untainted would require the defendants to disclose the confidential information, which in turn would give the prosecutor access to the very information the defendants sought to keep confidential—is not at issue in the present case. (*Barber*, *supra*, 24 Cal.3d at p. 758.) We are not considering whether a defendant's confidences adequately can be protected during trial by a particular remedy, but rather whether defendant has established that the judgment against him should be overturned. In this context, we discern no impropriety in requiring that defendant disclose the intercepted call's contents in order to prove its interception harmed him or benefited the prosecution, in much the same manner that a defendant who contends his conviction or sentence should be reversed because his attorney provided ineffective assistance often must disclose confidential aspects of the preparation of the defense in order to prove the claim. We also observe that the trial court delayed resolving defendant's motion to dismiss until after trial, at which point the disclosure to

the prosecution of the transcripts of the call could not have aided in its presentation of the case to the jury. (Cf. *Towler*, *supra*, 31 Cal.3d at p. 122 [distinguishing *Barber* because the defendant in *Towler* "would not have had to provide any information that the prosecutor did not already know because the confidential information was contained in a written document that the prosecutor had seized"].)

Accordingly, we conclude that, assuming defendant's state constitutional right to counsel was violated, he is not entitled to reversal of the judgment unless he can demonstrate a reasonable probability that, absent the violation, the trial's outcome would have been more favorable to him. Defendant has failed to do so for the same reasons he has failed to prove his other constitutional claims. No evidence establishes the prosecution gained anything from intercepting the call or that the defense was affected negatively in a way that could have changed the trial's outcome. Because defendant has not established a reasonable probability that, without the assumed violation of his right to counsel, the result of the trial would have been more favorable to him, we will not reverse the judgment.[29]

### 6. *Reference to Murder of Peace Officer Special Circumstance During Jury Selection*

When voir dire of the prospective jury commenced, the information alleged the special circumstance of murder of a peace officer under section 190.2, subdivision (a)(7). Defendant unsuccessfully had challenged this allegation in a section 995 motion on the ground that no evidence was presented at the preliminary hearing indicating the assailant knew or reasonably should have known Agent Cross was a peace officer. After the jury returned a verdict on the murder charge and firearm allegations, and before the special circumstance portion of the trial, the trial court granted the prosecutor leave to amend the information to allege the special circumstance of murder of a federal law enforcement agent (§ 190.2, subd. (a)(8)), as Cross was not a "peace officer" as defined in section 190.2, subdivision (a)(7) and as charged in the information. (See § 830.1 et seq.) Defendant then moved for a directed verdict of not true on the new allegation because no evidence established he knew or reasonably should have known Cross was a *federal* law enforcement agent. The trial court granted the motion, noting there was evidence defendant knew Cross was some type of law enforcement officer, but no evidence he knew or should have known Cross worked for the federal authorities. As a

---

[29] As with defendant's Sixth Amendment claim, because we conclude the judgment should not be overturned, we need not decide what would be the appropriate remedy—for example, retrial or dismissal of the charges with or without prejudice—in a case in which a defendant establishes a reasonable probability that the outcome of the trial was affected by a violation of the right to counsel resulting from the state's invasion of the attorney-client relationship.

result, the only special circumstance allegations submitted to the jury were the robbery-murder and prior-murder-conviction circumstances, both of which the jury found to be true.

On appeal defendant claims he was denied a fair trial because certain questions in the juror questionnaire and questions orally posed by the trial court during voir dire addressed whether the prospective jurors' impartiality would be affected by the peace-officer-murder special-circumstance allegation. He contends these references "implanted" this invalid special circumstance in the prospective jurors' minds, improperly emphasized that this case involved the murder of a peace officer, and improperly suggested the peace officer aspect of the case "was a special circumstance that warranted the death penalty." Defendant did not raise such a claim in the trial court; in fact, he requested one of the questions in the questionnaire on this subject, and he did not object to other related questions in the questionnaire or to those the trial court asked the prospective jurors. Assuming, without deciding, that defendant has not waived or forfeited this claim because he later successfully moved for a directed verdict on the allegation, we conclude the claim is without merit.

The trial court could not have known when voir dire commenced, before the presentation of any evidence, that the prosecution would fail to prove the elements of the special circumstance of murder of a federal law enforcement agent, especially because defendant had not argued that the prosecution had charged the incorrect special circumstance, or that the evidence was insufficient to prove the correct allegation. Despite defendant's claim to the contrary, it does not become retroactively improper for the trial court to have inquired of the prospective jurors concerning the potential for bias resulting from a charged allegation, even though it ultimately was not submitted to the jury due to a shortcoming in the evidence presented at trial. Although the jury was not called upon to render a verdict on the peace-officer-murder special circumstance, the juror questionnaire and the trial court properly explored that issue during voir dire.

In any event, defendant has not established prejudice resulting from the alleged error. One purpose of the questionnaire and voir dire was to weed out prospective jurors who would be improperly influenced by the fact that a law enforcement officer had been murdered. Defendant provided no evidence that any juror in his trial actually was biased. His conclusory claims that the questions "infected" the jurors are insufficient to show that the purpose of conducting voir dire was nullified. Even if no special circumstance related to the murder of a law enforcement officer had been alleged, the trial court and the parties likely would have explored the potential for bias that might arise from the fact that the victim was a law enforcement agent, a fact that would

have come to light at trial regardless whether a special circumstance involving a peace officer or federal agent was alleged. Thus, questioning the prospective jurors about their views concerning the murder of a peace officer in the specific context of a special circumstance allegation, even if erroneous, could not have prejudiced defendant.

B. *Guilt Phase Claims*

1. *Admission of Agent Bulman's Photographic Identification of Defendant*

On the night before the trial began, the prosecutors met with Agent Bulman and showed him five photographs they intended to introduce at trial: a photograph of Terry Brock; a 1980 booking photograph of Terry Brock; a 1984 booking photograph of defendant; a 1983 driver's license photograph of defendant, which may have been taken in 1978; and a 1980 booking photograph of Charles Brock. Bulman identified the photographs of Terry Brock as looking "closest to" the person with whom Bulman struggled in the street, and the photographs of defendant as looking "closest to" the person who had the shotgun. Bulman did not recognize Charles Brock from his photograph. When the prosecutor began to question Bulman about the photographs at trial the next day, defendant objected to the manner of the previous night's identification, and the fact that the prosecution had not told the defense that Bulman would identify defendant's photographs as depicting the person with the shotgun. The trial court overruled the objection, finding nothing improper in showing a witness photographs to be introduced at trial, but stated that it would consider a request for a continuance if defense counsel needed more time to prepare for cross-examination. Bulman then testified about his identification of the photographs, and was cross-examined on the subject the next day. As noted earlier, Bulman did not identify defendant in court as the person who had the shotgun. On appeal, defendant contends showing the photographs to Bulman before trial was an impermissibly suggestive identification procedure, resulting in a unreliable identification that was admitted at trial in violation of defendant's federal and state due process rights. (See *Neil v. Biggers* (1972) 409 U.S. 188 [34 L.Ed.2d 401, 93 S.Ct. 375]; *People v. Ochoa* (1998) 19 Cal.4th 353, 411–412 [79 Cal.Rptr.2d 408, 966 P.2d 442] (*Ochoa*).)

 ██ "In order to determine whether the admission of identification evidence violates a defendant's right to due process of law, we consider (1) whether the identification procedure was unduly suggestive and unnecessary, and, if so, (2) whether the identification itself was nevertheless reliable under the totality of the circumstances, taking into account such factors as the opportunity of the witness to view the suspect at the time of the offense, the

witness's degree of attention at the time of the offense, the accuracy of his or her prior description of the suspect, the level of certainty demonstrated at the time of the identification, and the lapse of time between the offense and the identification." (*People v. Cunningham* (2001) 25 Cal.4th 926, 989 [108 Cal.Rptr.2d 291, 25 P.3d 519].) "We review deferentially the trial court's findings of historical fact, especially those that turn on credibility determinations, but we independently review the trial court's ruling regarding whether, under those facts, a pretrial identification procedure was unduly suggestive." (*People v. Gonzalez* (2006) 38 Cal.4th 932, 943 [44 Cal.Rptr.3d 237, 135 P.3d 649].) "Only if the challenged identification procedure is unnecessarily suggestive is it necessary to determine the reliability of the resulting identification." (*People v. Yeoman* (2003) 31 Cal.4th 93, 125 [2 Cal.Rptr.3d 186, 72 P.3d 1166] (*Yeoman*).)

Here, we assume for the sake of argument that the procedure was suggestive to some degree because Agent Bulman repeatedly had identified Terry Brock, previously had failed to identify Charles Brock, and the only remaining pictures were of defendant. Nonetheless, showing the photographs to Bulman in this manner was not *unduly* suggestive and unnecessary. The prosecutors intended to introduce several photographs at trial that were significant, in and of themselves, separate from Bulman's identification of them. For example, any differences in defendant's physical appearance in the photographs and at trial could explain Bulman's current inability to identify defendant; the jury could compare the photographs to the composite drawing of the suspects made at Bulman's direction; and the jury could compare the photograph of Charles and the composite drawings of the two suspects to consider whether the photograph eliminated Charles as a participant in the crime. As part of their trial preparation, the prosecutors asked if Bulman recognized anyone depicted in the photos. This is quite different from an officer showing a possible witness a photographic lineup during the investigatory stages of a case, when one reasonably would expect that, absent any exigent circumstances, police would take time to ensure that any suggestiveness is minimized. In the specific circumstances here, we would not necessarily expect lawyers trying to learn what a witness's testimony about trial exhibits will be to take time to hide the photographs at issue among others irrelevant to the case in order to create a less suggestive procedure.

Moreover, because Bulman did not identify defendant in court as the person with the shotgun, showing him the photographs could not have tainted a later identification. (Cf. *Simmons v. United States* (1968) 390 U.S. 377, 384 [19 L.Ed.2d 1247, 88 S.Ct. 967].) In fact, it is significant that the prosecutors already knew Bulman had not identified defendant at the preliminary hearing or at a prior live lineup. It is therefore highly unlikely they showed him the photographs in the hope of inducing him to identify defendant in court the next day. To the contrary, Bulman's history as a witness showed he was not

susceptible to making a false identification even in the more suggestive situation of viewing defendant in court. The prosecutors reasonably could have expected Bulman's continued frankness when viewing photographs in preparation for his testimony, despite the potentially suggestive way in which the photographs were presented.

■ We are unaware of any authority that suggests that, had the prosecution waited until Bulman was on the witness stand to show him the photographs, and had Bulman made the same identifications, such a procedure would be subject to a constitutional challenge. Rather, in such circumstances, defendant would have explored the reliability of the identifications on cross-examination. Here, the prosecutors showed Bulman the exhibits the night before trial to learn what he would say about them before asking him in front of the jury. This was not an unduly suggestive and unnecessary procedure under the facts of this case, and we therefore need not evaluate the reliability of the identification. (*Yeoman, supra,* 31 Cal.4th at p. 125.) That Bulman was allowed to testify he had identified defendant's photographs as closely resembling the person who had the shotgun did not render defendant's trial unfair. The circumstances of the identification were disclosed to the defense, they were the subject of thorough cross-examination, and the jury was able to evaluate the reliability of Bulman's identification by comparing the photographs to the composite drawing and to defendant's current appearance at trial. As the high court stated in *Manson v. Brathwaite* (1977) 432 U.S. 98, 116 [53 L.Ed.2d 140, 97 S.Ct. 2243], "[E]vidence with some element of untrustworthiness is customary grist for the jury mill. Juries are not so susceptible that they cannot measure intelligently the weight of identification testimony that has some questionable feature."

### 2. *Admission of Blood Tests Conducted on the Jacket*

Defendant contends the testimony regarding the presumptive blood tests conducted on the seized jacket should not have been admitted because the evidence was irrelevant and unduly prejudicial under sections 350 and 352 of the Evidence Code, respectively, and because its admission violated his federal constitutional right to a reliable determination of guilt.

Relevant evidence is evidence "having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210.) On appeal we consider "(1) whether the challenged evidence satisfied the 'relevancy' requirement set forth in Evidence Code section 210, and (2) if the evidence was relevant, whether the trial court abused its discretion under Evidence Code section 352 in finding that the probative value of the [evidence] was not substantially outweighed by the probability that its admission would create a substantial danger of undue

prejudice." (*People v. Scheid* (1997) 16 Cal.4th 1, 13 [65 Cal.Rptr.2d 348, 939 P.2d 748].) "The trial court is vested with wide discretion in determining the relevance of evidence," although a court "has no discretion to admit irrelevant evidence." (*People v. Babbitt* (1988) 45 Cal.3d 660, 681 [248 Cal.Rptr. 69, 755 P.2d 253].)

█ Defendant relies on *People v. Slone* (1978) 76 Cal.App.3d 611, 631 [143 Cal.Rptr. 61], and decisions from two other states, *State v. Fukusaku* (1997) 85 Haw. 462 [946 P.2d 32], and *Young v. State* (1994) 316 Ark. 225 [871 S.W.2d 373], to argue that the presumptive blood tests performed are irrelevant in the absence of positive confirmatory test results indicating the stains were human blood. We rejected the reasoning in *Slone* as unpersuasive in *People v. Burgener* (1986) 41 Cal.3d 505, 527 [224 Cal.Rptr. 112, 714 P.2d 1251]. Furthermore, over two decades ago, we noted that California courts had long allowed the admission of the results of presumptive tests for blood. (*People v. Coleman* (1988) 46 Cal.3d 749, 775 [251 Cal.Rptr. 83, 759 P.2d 1260].)[30] We see no reason to reconsider that conclusion.

The circumstance that presumptive tests for blood on a jacket that might have been defendant's indicated the jacket might have had bloodstains in a pattern consistent with the murder in issue tends "in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210.) The factors raised in defendant's challenge to this evidence—that the presumptive tests could not confirm the substance tested was human blood, that confirmatory tests failed to confirm the presence of blood, and that it is unknown when the jacket might have been exposed to the substance that created the positive results—do not mean the test results have *no* tendency in reason to establish that defendant shot Agent Cross. Those issues affect the probative weight of the evidence, not whether the test results meet the threshold requirement of relevancy. The trial court did not abuse its discretion in finding this evidence was relevant.

█ Similarly, the trial court did not abuse its discretion by finding that the danger of undue prejudice, confusion of the issues, or misleading the jury

---

[30] Other states have rejected the contention that presumptive blood tests, and specifically the luminol and phenolphthalein tests performed here, are inadmissible on relevancy grounds. (See *State v. Canaan* (1998) 265 Kan. 835 [964 P.2d 681, 694] [luminol test results admissible because the test's presumptive nature goes to weight of the evidence, not its admissibility]; *State v. Stenson* (1997) 132 Wn.2d 668 [940 P.2d 1239, 1262–1263] [same, as to phenolphthalein test results]; see also *State v. Carriger* (1979) 123 Ariz. 335 [599 P.2d 788, 792]; *Mackerley v. State* (Fla.Dist.Ct.App. 2005) 900 So.2d 662, 663–664; *Commonwealth v. Duguay* (1999) 430 Mass. 397 [720 N.E.2d 458, 462–463]; *Jackson v. State* (Miss.Ct.App. 2005) 924 So.2d 531, 546; *State v. Moseley* (1994) 336 N.C. 710 [445 S.E.2d 906, 912]; *State v. Carillo* (1979) 122 R.I. 392 [407 A.2d 491, 494–495]; *Arrick v. State* (Tex.Crim.App. 2003) 107 S.W.3d 710, 720–721; *State v. Wyant* (1985) 174 W.Va. 567 [328 S.E.2d 174, 179–180].)

did not substantially outweigh the evidence's probative value. " 'The "preju-dice" referred to in Evidence Code section 352 applies to evidence which uniquely tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues. In applying section 352, "prejudicial" is not synonymous with "damaging." ' " (*People v. Karis* (1988) 46 Cal.3d 612, 638 [250 Cal.Rptr. 659, 758 P.2d 1189].) Evidence need not be excluded under this provision unless it "poses an intolerable ' "risk to the fairness of the proceedings or the reliability of the outcome." ' " (*People v. Guerra* (2006) 37 Cal.4th 1067, 1114 [40 Cal.Rptr.3d 118, 129 P.3d 321].) The testimony regarding the presumptive blood tests had no particu-larly emotional component, nor did it consume an unjustified amount of time. Further, because the defense fully explored the limitations of the presumptive tests through cross-examination, there is no likelihood this evidence confused or misled the jury. The trial court did not err, and defendant's constitutional rights were not violated.

### 3. *Admission of Defendant's Refusal to Stand in the Lineup*

Defendant contends evidence regarding his refusal to participate in the lineup planned for April 3, 1990, should have been excluded under section 352 of the Evidence Code. Defendant's objection at trial, however, was based only on the relevance of this evidence, not whether it was unduly prejudi-cial.[31] Defendant therefore has forfeited his claim that the trial court abused its discretion under Evidence Code section 352 by admitting this evidence. (Evid. Code, § 353, subd. (a); *People v. Partida* (2005) 37 Cal.4th 428, 433–434 [35 Cal.Rptr.3d 644, 122 P.3d 765] (*Partida*).)

Defendant unpersuasively argues that the evidence he refused to participate in the lineup was irrelevant. The evidence was relevant for the purpose of establishing his consciousness of guilt. (See *People v. Johnson* (1992) 3 Cal.4th 1183, 1223, fn. 9 [14 Cal.Rptr.2d 702, 842 P.2d 1].) Defendant disputes the inferences to be drawn from this evidence, arguing a reason other than consciousness of guilt explains his decision, namely, that he had followed his attorney's advice. However, as the trial court noted, the jury also could reasonably interpret the evidence to find defendant used the advice as an excuse to avoid standing in the lineup in an attempt to prevent a witness from identifying him. The jury reasonably might question why, if he were not involved in the shooting, defendant would not want to appear in the lineup to clear his name despite his attorney's advice. That the jury also could draw reasonable inferences from the evidence that might not support a finding of

---

[31] Defendant made an Evidence Code section 352 objection only to admission of a part of his signed refusal form that referred to his pending triple murder case, a case unrelated to the purpose of the lineup; that portion of the form was redacted.

guilt does not make the evidence irrelevant. The trial court did not abuse its discretion in allowing its admission.

Even if he had not forfeited his alternative claim, defendant has not shown that the evidence's probative value was substantially outweighed by the danger of undue prejudice, confusion of issues, or misleading the jury. As with the blood test evidence, the lineup refusal evidence was not especially emotional, the possible reasons why defendant chose not to participate were fully developed, and the issue was not especially time consuming, or so confusing or misleading that it was beyond the jury's ability to resolve based on the presented evidence.

### 4. *Admission of Testimony Regarding Telephone Calls Between Defendant and April Watson*

In September 1990, Detective Henry interviewed April Watson concerning several telephone calls she received from defendant in August 1990. Watson said that in the calls, defendant expressed concern that Terry Brock might be cooperating with the police. Defendant told Watson to find out if that was true, and to tell Terry to "stay strong." In November 1990, Watson told Henry that defendant had called her again in late October concerning his suspicions regarding Terry.

Before Watson was called to testify, defendant moved on relevance grounds to exclude testimony about these calls because it was not definitively known whether they pertained to the Cross murder case or the triple murder case. Observing that defendant already had been convicted of the triple murder when the calls were made, the trial court denied the motion. It noted that defendant could present to the jury his theory of the possible subject of the calls, while acknowledging that defendant probably would not want to do so given his effort to keep references to the triple murder case out of this trial.

When Watson testified about the August calls, she professed to remember only being interviewed by Detective Henry, and said she had no specific memory of telling him about calls from defendant or of the details of the calls. When asked leading questions concerning the specific contents of her statements at the September interview, Watson testified it was "possible" she made those statements and that she "believe[d]" she had been truthful during that interview.

The prosecution later called Detective Henry to testify about Watson's statements about the calls.[32] After addressing Watson's statements from the September interview, the prosecutor asked if Henry later received a call from Watson (the November call). Defendant objected based on lack of foundation. The trial court overruled the objection. The trial court later overruled the same objection after the prosecutor asked Henry what Watson said in the November call. Henry then testified that Watson told him defendant again had asked if she knew where Terry was housed, and that she told defendant she did not know.

On appeal, defendant renews his relevance objection to admission of the contents of Watson's statements to Detective Henry about what defendant told her in the telephone calls.[33] He also argues that Henry's testimony about those statements was inadmissible hearsay under section 1200, subdivision (b) of the Evidence Code, and that the erroneous admission of the statements' contents violated his federal due process rights.

Defendant contends evidence concerning his calls to Watson was irrelevant because another inference besides consciousness of guilt regarding the Cross murder might be drawn from them, namely, that when he called Watson he was concerned Terry was cooperating in the triple murder case. We agree with the trial court that this scenario is highly unlikely because defendant already had been convicted of the three murders and knew he was a suspect in the Cross murder, having been asked to stand in the lineups in this case. His statements to Watson have some "tendency in reason" to support an inference that he did not want Terry, who was implicated as having been defendant's partner in the Cross murder, to tell police that defendant was the one who killed Agent Cross. Given that defendant would have been the only possible source of *direct* evidence of what he had meant in making the statements, the prosecution was obliged to rely on inferences arising from the statements to establish defendant's state of mind. Contrary to his assertion, had defendant chosen to argue that the calls might have concerned a different

---

[32] When Henry began to testify that Watson told him she also had received calls from Eileen Smith, defendant objected to testimony about those calls on hearsay grounds. The trial court erroneously stated that Watson had been asked about Smith's calls despite defense counsel's correctly insisting to the contrary. Defense counsel then stated, "All right. I assume that the People are going to bring out information relating to the telephone calls that [Watson] talked about." The prosecution agreed with counsel's assumption. The trial court then overruled the objection pursuant to the hearsay exception for prior inconsistent statements. The prosecution, however, did not elicit any more testimony from Henry about any calls Watson received from Smith.

[33] At trial, Watson never confirmed what defendant said to her during the October and November calls. Although defendant primarily frames this argument as a challenge to the relevance of Watson's trial testimony, we construe it, as it was raised in the trial court, as encompassing the admission of Watson's statements as a whole, i.e., to include Henry's recounting of those statements.

case, requiring the jury to choose between the reasonable, possible interpretations of the statements' significance would not invite the type of speculation that supports exclusion of the evidence.

As to the hearsay nature of Detective Henry's testimony regarding the statements Watson gave at the September interview concerning defendant's calls, our review of the record reveals that defendant failed to object to this testimony at trial. Defense counsel objected only to Henry's testimony regarding statements that were *not* brought up during Watson's testimony, namely, calls to Watson from Eileen Smith, and Watson's November call to Henry. Defendant has forfeited his claim on appeal that Henry's testimony about defendant's August calls was inadmissible hearsay. (Evid. Code, § 353, subd. (a); *Partida, supra,* 37 Cal.4th at pp. 433–434.) In any event, the claim is meritless.

Although defendant claims Henry's testimony was "double-hearsay" (see Evid. Code, § 1201), the majority of the testimony was "single hearsay" because, for example, defendant's requests for information about Terry and for Watson to tell Terry to "stay strong" were not offered for their truth, but rather for the fact that defendant made the statements. (Evid. Code, § 1200, subd. (a); *People v. Jurado* (2006) 38 Cal.4th 72, 117 [41 Cal.Rptr.3d 319, 131 P.3d 400].) To the extent defendant's statements that he had heard "some things that wasn't [*sic*] right" and that Terry had been seen with the police were offered to prove defendant had in fact heard these things, Henry's testimony was multiple-level hearsay, but the first level (from defendant to Watson) was an admission of a party, and therefore admissible under Evidence Code section 1220. (*People v. Horning* (2004) 34 Cal.4th 871, 898 [22 Cal.Rptr.3d 305, 102 P.3d 228].)

The crux of the issue is whether Henry's testimony regarding what Watson told him about defendant's August calls was admissible under a hearsay exception. Had defendant objected to the testimony on this ground, the trial court would have acted within its discretion to overrule the objection under the prior inconsistent statement exception of Evidence Code section 1235. (See *People v. Martinez* (2000) 22 Cal.4th 106, 120 [91 Cal.Rptr.2d 687, 990 P.2d 563] [trial court's finding regarding applicability of a hearsay exception is reviewed for abuse of discretion].) This hearsay exception provides that "[e]vidence of a statement made by a witness is not made inadmissible by the hearsay rule if the statement is inconsistent with his testimony at the hearing and is offered in compliance with Section 770." (Evid. Code, § 1235.) That the requirements of Evidence Code section 770 were met here is undisputed, given that Watson was asked directly about the contents of her September statements to Henry during her testimony. (Evid. Code, § 770, subd. (a) ["Unless the interests of justice otherwise require,

extrinsic evidence of a statement made by a witness that is inconsistent with any part of his testimony at the hearing shall be excluded unless: [¶] (a) The witness was so examined while testifying as to give him an opportunity to explain or deny the statement . . . ."].)

Defendant contends Watson's testimony was not inconsistent for purposes of this hearsay exception because she did not contradict her earlier statements to Henry, but merely professed being unable to recall the details of what she had said. However, when a witness's claim of a lack of present memory of prior statements is based on deliberate evasion, inconsistency is implied. (*People v. Ervin* (2000) 22 Cal.4th 48, 84–85 [91 Cal.Rptr.2d 623, 990 P.2d 506].) The record supports a finding of such an inference here. Watson's testimony was not even internally consistent: in successive answers to the prosecutor's questions, she claimed she did not recall "anything happening in 1990, August and September," but she then recalled receiving a call from defendant, but stated she did not recall the nature of the call. While she specifically remembered being interviewed at the police station, when confronted with the contents of her statements there, Watson repeatedly said only it was "possible" she said those things. On this record,[34] there is a reasonable basis for finding Watson's claimed lack of memory was based on her unwillingness to cooperate. Accordingly, had defendant objected to Henry's testimony regarding Watson's statements about the August calls, the trial court would not have abused its discretion in admitting that testimony.

Defendant did, however, object to Henry's testimony about what Watson said regarding defendant's October call, which she reported to Henry in her November call. Assuming defendant's objections to a lack of foundation were adequate to alert the trial court to the fact that the prosecutor had not asked Watson about this later statement during her testimony, we conclude the trial court abused its discretion in allowing the testimony.[35] Because Watson never was asked about her November call to Henry, the record does not support the application of the exception for either a prior inconsistent statement or a past recollection recorded. (Evid. Code, § 1237.) As to the first exception, Watson was excused at the end of her testimony and was therefore not provided an opportunity to explain or deny that statement. (Evid. Code, § 770, subds. (a), (b).) As to the latter exception, it was not established that Watson had

---

[34] Defendant did not object to this part of the testimony. Therefore, our analysis cannot account for other factors that might have been developed on the record had the trial court been asked to rule on an objection.

[35] As noted earlier, defendant already had unsuccessfully argued that Detective Henry had exceeded the scope of what was brought out in Watson's testimony with regard to Eileen Smith's calls, and counsel had stated his assumption that the prosecutor would ask only about calls to which Watson had testified, an assumption with which the prosecutor agreed. Also, the trial court overruled the later objections to the November statement without inviting further explanation from counsel.

"insufficient present recollection to enable [her] to testify fully and accurately" about that statement. (Evid. Code, § 1237, subd. (a).)

We conclude this error was harmless under both the *Watson, supra,* 46 Cal.2d 818, standard for assessing the prejudicial effect of state error (requiring the defendant establish a reasonable likelihood of a more favorable outcome absent the error), and the *Chapman v. California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 87 S.Ct. 824], standard for evaluating the prejudicial effect of federal constitutional error (requiring the prosecution establish the error was harmless beyond a reasonable doubt). The substance of this testimony was that defendant called Watson and "still wanted to know where Terry was housed," and Watson said she did not know. Because Henry's testimony regarding Watson's statements at the September interview, which were more explicit and thus much stronger evidence of defendant's state of mind (consciousness of guilt), had been admitted properly, the fact that the jury improperly learned defendant called again to ask the same question about where Terry was housed could not have affected its verdict.

### 5. Admission of Testimony Regarding Defendant's Prior Commission of a "Serious Criminal Offense"

Defendant contends admission of testimony regarding his prior commission of a "serious criminal offense" violated sections 1101 and 352 of the Evidence Code and his federal due process rights. We disagree.

As the trial court recognized, Jessica Brock was the crucial witness in this case. The following critical inconsistency emerged in her testimony. She previously had told police that on the night Agent Cross was murdered, defendant came to her apartment with blood on his shirt, washed blood off what appeared to be the barrel of the Secret Service shotgun, told her he had to "take someone out" near the airport because it was "either him or them," and was worried about the police finding him. However, she testified on cross-examination and told the defense attorney in an interview that this incident happened two years earlier at a different apartment, and that both defendant and her brother Terry were there.[36] On further cross-examination and redirect, Jessica testified there were two separate visits, one by defendant and Terry, and a later one by defendant alone. The trial court aptly observed that Jessica's first statement that defendant came to her apartment on the night of Cross's murder "would point the finger straight at the defendant and I would not be surprised if the jury would convict if they credited that earlier

---

[36] Jessica's trial testimony was inconsistent with essentially every relevant detail she originally told the police about defendant's visit. The trial court commented that it appeared "[s]he [was] trying to serve so many masters here, her brother, her family, [defendant], his family, that she has told stories all over the place."

statement," but, if they credited her statement to defense counsel that there was only one visit two years before Cross was murdered, "then that evidence is absolutely 100 percent diffused and the jury is left with very little evidence as to the defendant's guilt."

The prosecutor pointed out to the trial court that the earlier visit appeared to coincide with the triple murder, and argued that Jessica had confused the two visits during her interview with the defense. To bolster Jessica's testimony that there were two separate visits, the prosecutor sought permission to ask her whether the two visits were distinct in her mind because she associated the first with the triple murder. At a hearing held without the jury present, Jessica testified about her memories of the visits and ultimately said she did associate the earlier visit with the triple murder. Defendant objected under section 352 of the Evidence Code to Jessica's mentioning the triple murder case in her testimony. The trial court gave a detailed analysis of the relative probative value of the evidence that Jessica distinctly remembered the earlier visit because of the triple murder, as opposed to the danger of undue prejudice to defendant. It then decided the proffered testimony was very important, and that the danger of undue prejudice, which the court acknowledged was potentially high, could be sufficiently reduced by limiting the scope of the testimony and providing an admonition regarding the limited purpose for which it would be admitted.

Accordingly, the trial court determined the prosecution would be permitted to elicit from Jessica that in October 1978, or soon thereafter, she learned that defendant and Terry allegedly had committed a "serious offense" that eventually resulted in a trial; she associated that offense in her mind with the visit by defendant and Terry; and she now was sure defendant made two separate visits. The court did not allow the prosecutor to elicit that the "serious offense" was a triple murder, that Jessica knew one of the victims, or that defendant and Terry were convicted of those charges. Jessica then testified before the jury that there were two separate visits and that she connected the earlier one with an allegation that defendant and Terry had committed a different offense that had made a strong impression on her.[37] As promised, the court instructed the jury that this evidence was admitted only as it related to Jessica's credibility, that it could be used in determining whether there was one visit or two, and that the jury must not speculate about the nature of the offense or use the testimony for any other purpose.[38]

---

[37] Despite the court's admonition to Jessica before her testimony that she not mention the "serious offense" was the triple murder, Jessica referred to the triple murder in response to a question from the prosecutor. This was the subject of defendant's motion for a mistrial, the denial of which defendant challenges on appeal, discussed, *post*, in part II.B.6.

[38] The court instructed that evidence received that indicated the defendant may have been involved in offenses other than the one for which he was on trial "was not received, and may

Because defendant did not object to this evidence at trial as improper character evidence under Evidence Code section 1101, he has forfeited such a claim. (Evid. Code, § 353; *Partida, supra,* 37 Cal.4th at pp. 433–434.) In any event, defendant's argument that admission of this evidence violated this provision, and his reliance on cases discussing it, are unavailing.

With exceptions not relevant here, "evidence of a person's character or a trait of his or her character (whether in the form of an opinion, evidence of reputation, or evidence of specific instances of his or her conduct) is inadmissible *when offered to prove his or her conduct on a specified occasion.*" (Evid. Code, § 1101, subd. (a), italics added.) Subdivision (b) of the same section, referred to as the "other crimes" provision, provides that "[n]othing in this section prohibits the admission of evidence that a person committed a crime, civil wrong, or other act when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident . . . other than his or her disposition to commit such an act." (Evid. Code, § 1101, subd. (b).) An example of the application of subdivision (b) would be a case in which the charged crime has distinct features similar to a prior crime that the defendant committed, and the prosecution seeks to present evidence of the prior crime to prove that the defendant committed both crimes. (See, e.g., *People v. Gray* (2005) 37 Cal.4th 168, 202–203 [33 Cal.Rptr.3d 451, 118 P.3d 496].)

Although defendant characterizes Jessica's testimony about the "serious offense" as "other crimes evidence" falling under this provision, the evidence was not offered to prove defendant's conduct. Instead, it was offered to explain Jessica's state of mind regarding why she recalled two separate visits. In fact, the jury was instructed this evidence was not received, and should not be considered, as proof that defendant had committed the *prior* offense to which Jessica referred.

We next consider the trial court's ruling under Evidence Code section 352. After reviewing for abuse of discretion the trial court's weighing of the probative value of the challenged evidence against the danger of undue prejudice and confusion of the jury, we cannot say its decision was outside

---

not be considered by you, as proof that such offenses were in fact committed by the defendant . . . [or] to prove that the defendant is a person of bad character, or that he has a disposition to commit crimes. [¶] Such evidence was received, and may be considered by you, only for the limited purpose of assisting you in your assessment of the credibility and testimony of . . . Jessica Brock. [¶] As to Jessica Brock, such evidence may also be used in resolving any conflict regarding whether the defendant visited the residence of Ms. Brock, and if he did, how many such visits occurred, and the timing, location, and the circumstances involved in such visit or visits. [¶] For the limited purpose for which you may consider such evidence, you must weigh it in the same manner as you do all other evidence in the case. You are not permitted to consider such evidence for any other purpose."

the bounds of reason. (See *People v. Osband* (1996) 13 Cal.4th 622, 666 [55 Cal.Rptr.2d 26, 919 P.2d 640].) If the jury found them credible, Jessica's initial statements to the police regarding defendant's visit hours after Agent Cross was murdered were the strongest evidence tying defendant to that murder. On the other hand, if the jury believed her statements to defense counsel that this visit occurred two years before Cross was murdered, defendant's behavior and statements during that visit could have had no connection to this case.

While defendant is correct that other aspects of Jessica's testimony besides her association of his prior visit with the "serious offense," such as the age of her child at relevant times, bolster her testimony that there were two separate visits, it is also true that defense counsel created this ambiguity by suggesting to Jessica during the interview she might have "switched the dates," and then by eliciting this inconsistent statement on cross-examination. It was within the bounds of reason for the trial court to find that Jessica's association in her mind of the first visit with a different serious offense defendant and Terry allegedly committed carried much more weight than the fact that she could also date the visits based on her child's age. The trial court also reasonably found this evidence to be significantly probative on the issue of Jessica's overall credibility as a witness, given that she had expressed no confusion about whether defendant's relevant visit happened in 1980 or 1978 when the police interviewed her, but that she later changed her story when defense counsel interviewed her, and then went back and forth during her trial testimony. That the defense was unhappy with the consequences of its having confronted Jessica with her inconsistency regarding the date of defendant's visit with the crowbar-like object does not mean the trial court was obliged to exclude the prosecution's evidence rebutting the contradiction that defendant had exploited.

The trial court recognized that admitting testimony that defendant and Terry together had been involved in a serious offense two years before the Cross murder created a significant risk of undue prejudice for the defense. However, the court took reasonable steps to minimize this danger by limiting the scope of the testimony and by giving an instruction that set forth the narrow manner in which the jury was permitted to consider this evidence.[39] For these reasons, we conclude the trial court did not abuse its discretion by admitting this testimony.

---

[39] We do not consider as part of this analysis Jessica's failure to follow the court's directions not to mention the triple murder during her testimony because, in ruling on the admissibility of the limited evidence it was allowing, the trial court reasonably could assume the witness would comply with the limitations.

### 6. *Denial of Motion for Mistrial*

The trial court's efforts to sanitize the testimony regarding the "serious offense" from any mention of the nature of that charge were frustrated when, in response to the prosecutor's question whether she connected the earlier visit by defendant and her brother Terry "with an offense that had been committed by both [of them] in 1978," Jessica asked, "What are you referring to? The triple murder?" The jury was excused, and defendant moved for a mistrial. After stating that it believed Jessica "for reasons of her own decided to blurt that answer out," the trial court denied the motion. When the jury returned, the court announced it was striking the last question and answer, and it directed the jury to disregard them. Over defendant's objection, the court later individually asked the jurors and alternates whether they had heard the question and answer. The court's questions were phrased in general terms and did not reveal what Jessica had said. Only two jurors said they had heard the triple murder statement, and they said they could disregard it in their deliberations. The court then admonished the jurors to disregard any statement they might have heard and not to discuss with other jurors what they individually had discussed with the court.

The trial court revisited the mistrial motion the next day. Defense counsel questioned the credibility of the jurors who said they had not heard the triple murder remark, but the court found no basis to doubt their answers. Although it believed the jurors who heard the statement but said they could disregard it, the court offered to consider removing them at defendant's request. Defendant, while explicitly stating he was not waiving the motion for a mistrial, said he would not ask the court to remove the two jurors. The trial court left them on the jury subject to its further consideration of whether they should be removed to eliminate the possibility of defendant's raising an ineffective assistance of counsel claim in a later proceeding, i.e., that no competent attorney would have allowed the two jurors to remain on the jury. The trial court later conducted an in camera, ex parte proceeding with defendant and his attorney in which they presented their tactical reasons for not asking the court to remove the jurors. The court ultimately did not dismiss the two jurors. On appeal, defendant contends the trial court should have granted his mistrial motion, and that its failure to do so violated section 1101 of the Evidence Code, defendant's federal due process rights, and his federal right to a reliable determination of guilt under *Beck v. Alabama* (1980) 447 U.S. 625 [65 L.Ed.2d 392, 100 S.Ct. 2382].

Because defendant did not mention Evidence Code section 1101 in conjunction with the mistrial motion, he has forfeited any claim that the trial court should have granted it on that ground. Regardless, that provision does not apply because the triple murder statement was not admitted to prove

defendant's conduct; in fact, it was stricken and the jury was admonished not to consider it for any purpose. As to the other grounds raised, "[a] mistrial should be granted if the court is apprised of prejudice that it judges incurable by admonition or instruction. [Citation.] Whether a particular incident is incurably prejudicial is by its nature a speculative matter, and the trial court is vested with considerable discretion in ruling on mistrial motions." (*People v. Haskett* (1982) 30 Cal.3d 841, 854 [180 Cal.Rptr. 640, 640 P.2d 776].)

We find no reason to disturb the trial court's determination that the jurors truthfully answered whether or not they had heard the triple murder remark. Accordingly, as to jurors who did not hear Jessica's statement, defendant has made no showing of prejudice. Regarding the two jurors who did hear the remark, defendant makes no showing of prejudice beyond his mere assertion that because of the nature of the statement, no juror would be able to follow the admonition to disregard it, but "[i]t must be presumed that the jurors acted in accordance with the instruction and disregarded the question and answer." (*People v. Cox* (2003) 30 Cal.4th 916, 961 [135 Cal.Rptr.2d 272, 70 P.3d 277].) We do not agree with respondent's claim that defendant invited error by not requesting the dismissal of these jurors. The error defendant challenges on appeal is the trial court's denial of his motion for a mistrial, which, if granted, would have had the practical effect of dismissing all of the jurors. It does not follow that, because for tactical reasons defendant did not agree to the offer of a lesser remedy, he gave up his right to challenge the denial of the full remedy he sought. Nonetheless, the fact that defendant did not avail himself of the option of removing the two jurors undercuts the claim that the trial court erred in finding that any potential prejudice could be cured by admonishing them to disregard the statement and not to mention it to other jurors. In fact, defendant personally stated during the in camera hearing that he believed the two jurors "were honest in their answers and . . . honest when they said they could put it to the side." The defense attorney said that, "in terms of evaluating them as fair and impartial jurors compared to the alternates that exist, we much prefer those two jurors," a "lesser of two evils" statement that still indicated counsel did not believe these jurors would be so prejudiced that they could not be fair at all. The trial court acted within its discretion in denying the motion for a mistrial.

### 7. *Exclusion of Testimony of Jacqueline Sherow*

Defendant contends the trial court abused its discretion by excluding the testimony of Jacqueline Sherow (see *People v. Lawley* (2002) 27 Cal.4th 102, 153 [115 Cal.Rptr.2d 614, 38 P.3d 461]), and thereby violated his federal due process rights.

It appears that, in a report of his 1992 interview with Sherow, Detective Henry stated that she told him she had a conversation with Charles Brock

some time after the Cross murder in which Charles said, "I had something to do with the killing of Julie Cross," or "I am involved in the murder of Julie Cross," and "I have to get away from here." In response to defendant's notice that he intended to call Sherow as a witness to testify concerning Charles's supposed statements, the prosecution objected, arguing the statements were hearsay and did not qualify as declarations against penal interest under section 1230 of the Evidence Code. In a hearing outside the presence of the jury, Sherow testified Charles told her "he knew about" the murder, and she had interpreted his statement to mean he was involved in it or knew who was involved. Sherow also testified that she did not ask Charles the nature of his involvement in the murder, and he provided her with no details on his own. The trial court excluded Sherow's testimony, finding that defendant had not satisfied the foundational requirements of the hearsay exception for statements against penal interest.

■■■ We conclude the trial court's decision to exclude Sherow's proffered testimony was not an abuse of discretion because defendant failed to establish that Charles's actual statement "so far subjected him to the risk of . . . criminal liability . . . that a reasonable man in his position would not have made [it] unless he believed it to be true." (Evid. Code, § 1230.) Sherow repeatedly testified at the hearing that Charles said only he "knew about" the murder. Merely knowing about a murder is not a crime, and it follows that admitting to someone that one knows about a murder is not a statement against one's penal interest, or any other interest listed in section 1230 of the Evidence Code.

Defendant's reliance on Detective Henry's report as supporting application of the hearsay exception is misplaced. The report is not part of the record but the prosecutor appears to have summarized it at the hearing. We observe that statements apparently set forth in quotation marks in that report may not be a verbatim record of what Sherow said Charles told her, as neither of them was likely to have referred to the victim as "Julie Cross." In addition, the report apparently states that what Charles told Sherow about his involvement was either he "had something to do with" *or* he was "involved in" the murder. Such uncertainty further lessens the likelihood the report was an exact record of what was said. Henry did not testify concerning whether he understood the statements in his report to be Charles's actual statements as Sherow recounted them, her interpretation of what Charles said, as Sherow testified at the hearing, or Henry's interpretation of what Sherow said Charles said. The only definitive evidence regarding what Charles actually may have said was Sherow's testimony at the hearing, testimony that did not establish that his statement was against his penal interest.

Even if the trial court erred by excluding Sherow's testimony, the error would be harmless under any standard. Charles's statements as testified to by

Sherow at the hearing, namely, that he only knew about the murder, were not inculpatory to any significant degree. Had Sherow testified at trial in the same manner, and had she subsequently been confronted with the statements apparently contained in Detective Henry's report—for example, pursuant to the hearsay exception for prior inconsistent statements under section 1235 of the Evidence Code—we discern no possibility that the jury would have reached a different verdict. The jury also would have learned that the statements in the report were Sherow's interpretation of the meaning of what Charles said, that he did not further elaborate concerning his "involvement" in the murder, and that he appeared to be under the influence of drugs during the conversation. In addition, the prosecutor might have reasonably argued that Charles was referring to his being involved in the murder in the sense that he had been arrested as a suspect, not that he actually played a role in committing the crime. The prosecutor also might have pointed out that Sherow's recollection and interpretation of the conversation could have been faulty because she had been drinking alcoholic beverages earlier that day. The less than compelling evidence that Charles might have said he was "involved in" or "had something to do with" the murder would not have affected the resolution of the key issue in the trial, namely, whether Jessica Brock's statements strongly incriminating defendant were credible. For these reasons, the exclusion of Sherow's testimony could not have affected the outcome of the trial.

### 8. *Sufficiency of the Evidence*

Defendant contends the evidence presented at trial was insufficient to establish that he was guilty of the Cross murder or to support the special circumstance finding that the murder was committed in the course of a robbery. We conclude substantial evidence supports the challenged verdict.

In reviewing a challenge to the sufficiency of the evidence, "we 'examine the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence—evidence that is reasonable, credible and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' [Citations.] We presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence. [Citation.] [¶] The same standard of review applies to cases in which the prosecution relies primarily on circumstantial evidence and to special circumstance allegations. [Citation.] '[I]f the circumstances reasonably justify the jury's findings, the judgment may not be reversed simply because the circumstances might also reasonably be reconciled with a contrary finding.' [Citation.] We do not reweigh evidence or reevaluate a witness's credibility. [Citation.]" (*People v. Guerra, supra,* 37 Cal.4th at p. 1129.)

Defendant argues the evidence was insufficient to support the guilty verdict because the trial court should have excluded certain testimony and evidence, and because Jessica Brock's testimony was not credible. As discussed, *ante*, we have concluded the challenged evidence, specifically the composite drawings of the suspects completed with Agent Bulman, Bulman's identification of defendant's photographs, and the presumptive blood tests on the seized jacket, was properly admitted. Therefore, that aspect of defendant's claim is without merit. As to Jessica's testimony, defendant is correct that Jessica's version of events changed numerous times between her pretrial statements to the police and the defense attorney, and during her trial testimony. However, we are convinced that a rational trier of fact reasonably could have believed the first version that Jessica gave to the police, the version that strongly incriminated defendant, and reasonably could have found that her story changed only because defendant, his family, Jessica's family, and even Jessica's own internal conflicted loyalties, pressured Jessica to lie and undermine the case against defendant.

The possible shortcomings defendant points to in Jessica's testimony, Agent Bulman's identification of defendant's photographs, the presumptive blood tests on the jacket, and the evidence of the eyeglasses found at the scene were brought out through the examination of the relevant witnesses and counsel's arguments to the jury. On appeal we do not reevaluate the weight or credibility of this evidence, nor do we examine each piece of evidence in isolation. Viewed in the light most favorable to the jury's verdict, the evidence and the reasonable deductions arising from it adequately support the jury's finding that defendant was guilty of Agent Cross's murder beyond a reasonable doubt. Even were we to conclude the evidence reasonably might be reconciled with a contrary finding, this would not warrant a reversal of the judgment.

Defendant challenges the robbery-murder special-circumstance finding on the grounds (1) that there was insufficient evidence that defendant intended to rob Agents Bulman and Cross; and (2) that the taking of the shotgun and keys constituted a robbery in the course of committing the murder, which would not support the special circumstance finding. (See *People v. Marshall* (1997) 15 Cal.4th 1, 41 [61 Cal.Rptr.2d 84, 931 P.2d 262] (*Marshall*).)

The special circumstance applies if defendant was engaged in the commission of, *or the attempted commission of*, a robbery. (§ 190.2, subd. (a)(17)(A).) The jury reasonably could have found from the evidence that the assailants identified the agents, who appeared to be civilians parked on a poorly lit street, as potential victims to rob, "cased" the victims by slowly driving by twice and by watching the agents from behind the vegetation-covered fence next to their car, and waited until it was dark to

commit their crime. The jury reasonably could have found that when defendant and the other assailant approached the agents' car from behind, one on each side and with at least one of them being armed with a firearm, they intended to take the agents' personal property from their presence by force or fear with the intent of permanently depriving them of that property and had taken a substantial step towards completing the robbery, and that they therefore were engaged in the attempted commission of a robbery. (*Marshall*, *supra*, 15 Cal.4th at p. 34 [defining robbery]; *People v. Swain* (1996) 12 Cal.4th 593, 604 [49 Cal.Rptr.2d 390, 909 P.2d 994] ["To constitute an attempt, there must be (i) proof of specific intent to commit the target crime and (ii) a direct, ineffectual act done towards its commission."].) The jury also reasonably could have found that once the would-be robbers discovered their victims were armed law enforcement officers who might apprehend them on the spot, defendant decided to murder the agents in order to facilitate his and his partner's escape from the botched robbery. (See *People v. Ainsworth* (1988) 45 Cal.3d 984, 1025–1026 [248 Cal.Rptr. 568, 755 P.2d 1017] [robbery-felony-murder special circumstance includes murder committed during period the perpetrator is in flight from the crime until he reaches a place of temporary safety].)

That the incident never progressed to the point where the assailants could say to the agents, "This is a robbery, give us your property," is immaterial because the reasonable inferences the jury could draw from the evidence amply support the finding that committing a robbery was their unspoken intent. Similarly, given that the jury reasonably could have found that defendant was engaged in an attempt to commit a robbery by the time he and his partner first contacted the agents, and that defendant subsequently murdered Agent Cross during his flight from this unsuccessful attempt, we need not consider whether, as defendant contends, the taking of the shotgun and the keys was an incidental "robbery in the course of a murder" such that reliance on that evidence to prove the special circumstance would violate the rule we stated in *Marshall*, *supra*, 15 Cal.4th at page 41, that "[t]he robbery-murder special circumstance applies to a murder in the commission of a robbery, not to a robbery committed in the course of a murder."

In sum, we conclude the evidence was sufficient to support the jury's guilty verdict and its finding that the robbery-murder special circumstance was true.

### 9. *Challenged Guilt Phase Jury Instructions*

#### a. *Aiding and Abetting*

The trial court gave CALJIC No. 8.27, regarding first degree felony-murder liability for an aider and abettor to a robbery or attempted robbery, and

CALJIC Nos. 8.80 and 8.81.17, during the special circumstance phase regarding the requirement that an aider and abettor in the commission of a murder in the first degree also have the intent to kill.[40] Defendant objected to these instructions on the ground that aiding and abetting was not "applicable" because the prosecution's theory was that defendant was the person who shot Agent Cross, and defendant's theory was that he did not participate in the crime at all. The trial court overruled the objection because, in the court's view, it was possible the jury might find that defendant participated in the robbery and murder, but was not the person who actually shot Cross, because the defense had strongly challenged the evidence regarding blood on his jacket, and had presented evidence that Terry or Charles Brock might have been the shooter, that Agent Bulman had not positively identified defendant as the shooter, and that Jessica Brock's statement did not establish that defendant actually admitted to being the shooter. Defendant claims the trial court erred by giving these instructions because no evidence supported his aiding and abetting liability, making the instructions unnecessary and confusing, and that this error also violated his federal due process rights.

 "The trial court has the duty to instruct on general principles of law relevant to the issues raised by the evidence [citations] and has the correlative duty 'to refrain from instructing on principles of law which not only are irrelevant to the issues raised by the evidence but also have the effect of confusing the jury or relieving it from making findings on relevant issues.' [Citation.] 'It is an elementary principle of law that before a jury can be instructed that it may draw a particular inference, evidence must appear in the

---

[40] The relevant parts of these instructions, as modified and given by the trial court, were as follows:

CALJIC No. 8.27: "If a human being is killed by any one of several persons engaged in the commission or attempted commission of the crime of robbery, all persons, who either directly and actively commit the act constituting such crime, or who with knowledge of the unlawful purpose of the perpetrator of the crime and with the intent or purpose of committing, encouraging, or facilitating the commission of the offense, aid, promote, encourage, or instigate by act or advice its commission, are guilty of murder of the first degree whether the killing is intentional, unintentional, or accidental."

CALJIC No. 8.80: "If you find beyond a reasonable doubt that the defendant was either the actual killer or an aider or abettor, but you are unable to decide which, then you must also find beyond a reasonable doubt that the defendant with intent to kill aided and abetted an actor in commission of the murder in the first degree, in order to find the robbery murder special circumstance to be true. On the other hand, if you find beyond a reasonable doubt that the defendant was the actual killer, you need not find that the defendant intended to kill a human being in order to find the robbery murder special circumstance to be true."

CALJIC No. 8.81.17: "As stated earlier, if the defendant is the actual killer, no intent to kill need be shown under this special circumstance. However, if the defendant is not the actual killer, but rather an aider and abett[or] to robbery or attempted robbery, or if you are unable to decide whether the defendant was the actual killer as opposed to an aider and abett[or], then you must also find beyond a reasonable doubt that the defendant had the intent to kill in order to find this special circumstance true."

record which, if believed by the jury, will support the suggested inference [citation].' [Citation.]" (*People v. Saddler* (1979) 24 Cal.3d 671, 681 [156 Cal.Rptr. 871, 597 P.2d 130].)

The instructions given were proper statements of the law on aider and abettor liability; defendant does not contend otherwise. Instead, he contends the fact the prosecution only argued to the jury that he was the actual killer means no evidence supported a finding that he was the other participant. We disagree. Although the prosecution pursued what it viewed as the strongest case against defendant, the trial court correctly articulated how, based on evidence presented at trial, the jury might possibly find defendant guilty as an aider and abettor despite both the prosecution and defense theories of the case. In addition, the jury was not required to agree unanimously whether defendant was the shooter or the other participant in the crime. (*People v. Majors* (1998) 18 Cal.4th 385, 408 [75 Cal.Rptr.2d 684, 956 P.2d 1137].) Because the evidence could support aiding and abetting liability, the trial court properly gave the aiding and abetting instructions.

Finally, we are not persuaded by defendant's contention that the aiding and abetting instructions confused the jurors and allowed some to vote to convict despite their not being convinced beyond a reasonable doubt of defendant's guilt. The assertion is based on pure speculation and is contradicted by the absence of anything in the record showing the jury was confused, as well as by the fact that the instructions properly stated the law. (See *People v. Cain* (1995) 10 Cal.4th 1, 34 [40 Cal.Rptr.2d 481, 892 P.2d 1224] [the jury is presumed to follow the instructions as given].)

b. *Consciousness of Guilt*

Defendant contends the trial court erred by instructing, pursuant to CALJIC Nos. 2.04 and 2.05, that the jury could infer defendant harbored a consciousness of guilt if it found he attempted to or did persuade a witness to testify falsely, or authorized someone else to attempt to procure false evidence. Together the instructions clarified that such conduct by defendant or his authorization of such conduct "is not sufficient by itself to prove guilt, and its weight and significance, if any, are matters for [the jury's] consideration." Defendant objected to these two instructions in the trial court.

Defendant first argues there was insufficient evidence to support giving these two instructions, but "to the extent [he] contends that facts giving rise to an inference of consciousness of guilt must be conclusively established before [the instructions] may be given, [he] is incorrect; there need only be some evidence in the record that, if believed by the jury, would sufficiently support the suggested inference. [Citations.]" (*People v. Coffman*

*and Marlow* (2004) 34 Cal.4th 1, 102 [17 Cal.Rptr.3d 710, 96 P.3d 30].) Here, the prosecution presented sufficient evidence to raise an inference that defendant, and others acting on his behalf and with his authorization, tried to persuade a witness to testify falsely. As the trial court noted, defendant contacted Jessica Brock shortly before defense counsel interviewed her, and she then recanted her statement to the police and said, instead, that defendant's visit happened two years before Cross was murdered. There was evidence that defendant's parents were in regular contact with defendant and also talked to Jessica before trial, after which her testimony was inconsistent in nearly every relevant aspect with her initial statements to the police. The jury reasonably could find that her changed statement and testimony were false and the result of pressure from defendant and his parents on his behalf. The jury also reasonably could infer, despite conflicting evidence to which defendant points, that defendant's sister Darcel Taylor sent a letter to Terry Brock at defendant's request for the purpose of convincing Terry to tell the police defendant had not participated in the Cross murder, and that defendant had asked April Watson to contact Terry for the same purpose.

For the first time in his reply brief, defendant also contends these instructions were improperly argumentative in that they "pinpointed" the prosecution's argument regarding how the jury should view certain evidence. He forfeited this claim by not raising it at trial or in his opening brief. In any event, we consistently have rejected such challenges to the standard consciousness of guilt instructions, and defendant presents no compelling reason for us to reconsider that conclusion. (See *Rundle, supra,* 43 Cal.4th at pp. 152–154.)

### c. *First Degree Murder*

Defendant contends the trial court erred by instructing the jury on first degree murder because the information alleged only that the murder of Agent Cross was committed with malice aforethought in violation of section 187. To the extent we may review this claim under section 1259 despite defendant's failure to raise it at trial because he alleges his substantial rights were affected, we previously have rejected this contention and discern no reason to revisit the issue. (See *People v. Morgan* (2007) 42 Cal.4th 593, 616–617 [67 Cal.Rptr.3d 753, 170 P.3d 129].)

Defendant also contends the trial court erred by failing to instruct that the jurors must unanimously agree on whether defendant was guilty of premeditated and deliberate first degree murder or felony first degree murder. Again, to the extent that we may review his claim under section 1259, it is without merit. (*People v. Riggs* (2008) 44 Cal.4th 248, 313 [79 Cal.Rptr.3d 648, 187 P.3d 363].)

10. *Asserted Improper Interference by the Trial Court with the Jury's Deliberations During the Guilt Phase*

Defendant contends the trial court violated his state and federal constitutional rights by invading the jury's deliberations in its questioning of the foreman and by improperly coercing a verdict in its instruction to the jury. He contends these errors deprived him of his right to trial by jury, a unanimous and reliable verdict, and due process of law. We disagree.

On the second day of the guilt phase deliberations, the jury requested a readback of Jessica Brock's testimony concerning defendant's visit to her apartment and of Agent Bulman's testimony concerning the composite drawings of the assailants and whether he had identified defendant from them. The next morning, the jury foreman gave the bailiff a note that asked for "help on a jury room problem." The note stated there was "one juror that will not listen to reason regarding circumstantial evidence & has stated from the start of deliberations that since we have no ID of the killer & their [*sic*] is no proof the glasses are defendants [*sic*], he is not guilty. I feel very strong about our obligation & responsibility, but feel our efforts are in vain. The other eleven jurors are willing to openly discuss the case & try to reach a unanimous decision. How can we convince the juror that this case depends on circumstantial evidence. I will formally poll the jury this morning & am prepared to stay with it as long as the discussions are productive."

The parties disputed how the trial court should respond. The prosecutor argued the note demonstrated the juror at issue was refusing to deliberate, and therefore should be removed. Defense counsel argued the note showed only that the juror was not convinced defendant's guilt had been proved beyond a reasonable doubt, and it appeared to counsel the juror was not doing anything improper. Defense counsel suggested that, before deciding whether to remove the juror, the court ought to question the jurors individually, reinstruct them on circumstantial evidence and the process of deliberating, and ask "if that is something that they can all do." The court decided to question only the foreman about the note. It also clarified that the jury had deliberated only one afternoon and part of the next morning before requesting the readback, which had been completed minutes before the court took up the matter of the foreman's note.

In response to the court's questions, the foreman said he had prepared the note at home the previous evening. He explained that, within the first 30 minutes of deliberations, the juror at issue was "basically non-cooperative. You try to talk in regards to circumstantial evidence or the fact that there are no positive i.d.'s on anybody, it is just that that means that it cannot be settled. And no room for real discussion." The foreman said the juror would

not discuss "certain topics," even when other jurors asked him questions, but he would discuss other topics. The juror refused to participate in attempts to "bypass an issue and go on to other issues building a chain of events." The foreman described the juror as "not receptive to the normal conversation that is going on in the jury room." He added that the jurors had discussed the instructions concerning circumstantial evidence, but the juror at issue "does not respond to that particular instruction . . . . He does not agree. That is cut out. The impression is that it is black and white and this case is not black and white." The foreman reported that the juror "is totally hung up on positive i.d.," and that the juror had said, " 'If we could positively identify him, I would fry his ass just like the rest of you. But without a positive i.d., I cannot see' or I don't know his exact words but to the extent that 'I cannot vote for guilty.' " The foreman believed the juror's decision that there could be no conviction without positive identification was made before deliberations began. The foreman mentioned that some jurors had suggested they take a vote regarding the verdicts, but that was not done "for a number of reasons because we felt we should talk about it certainly a lot more longer than a half hour or so." The court directed the foreman to return to the jury room and resume deliberating, and not to mention to the other jurors the discussion they had had.

The parties again disputed whether the juror was refusing to deliberate or follow the law and should be removed, or whether he simply had a particular view of the weight of the evidence and was not acting improperly. Defense counsel again suggested the court only reread the instructions concerning circumstantial evidence and the deliberation process. Counsel also objected when the prosecutor suggested the court should instruct the jury that eyewitness identification is not required for a conviction. The trial court recognized the possibility that this was "an eleven to one situation," and that it must be "very careful that anything we do . . . is not taken by the jurors as being an order or coercion toward resolving this case at all costs." The court acknowledged the jury might be in disagreement over the weight of the evidence, but noted "the other possibility is that there is a misunderstanding that a juror believes that you have to have a particular form of testimony . . . . [¶] The juror may believe that you need that type of direct evidence [(eyewitness testimony)] in order to convict when in fact the issue is given all the evidence, whether it be direct or circumstantial or any combination thereof, is there proof beyond a reasonable doubt of the truth of the charge. [¶] That is in the charge I gave the jury and that is the law." The court also observed that "there were quite a few witnesses and exhibits, [but] almost immediately upon the deliberation process we had a fairly firm position taken." Defense counsel requested that if the court gave an instruction concerning the absence of a legal requirement for eyewitness positive identification evidence, it also

mention other types of evidence, such as fingerprints and confessions, so the instruction would not focus only on eyewitness evidence. The court agreed to do so.

The trial court subsequently reread to the entire jury the circumstantial evidence instructions. (CALJIC Nos. 2.00, 2.01.) It also gave an instruction concerning the factors the jury might consider in evaluating identification evidence (CALJIC No. 2.92), and read instructions concerning how the jury should deliberate (CALJIC Nos. 17.40, 17.41).

The court then gave additional instructions concerning the jury's consideration of the evidence. It first reminded the jurors, "there is no preference for direct evidence or no preference for circumstantial evidence, there is a special rule, 2.01, that applies when the case is based on circumstantial evidence." After suggesting the jurors reread and discuss that instruction, the court added that, "in terms of the forms or sorts of evidence that you might see in the homicide case or in other case[s], you might see fingerprints. You might see confessions. You might see eyewitness identification in court. [¶] There is no requirement under the law that there is any—that there be fingerprints or a confession or be someone who comes into court and identifies a defendant as the perpetrator of the crime." The court explained that the issue is that "[g]iven the evidence presented by the People and their witnesses and their items of evidence, and given the evidence presented by the defense and their witnesses and items of evidence, you take that mound, that group of facts as you determine from the evidence, and you ask yourself are the proven facts sufficient to convince me beyond a reasonable doubt that the defendant is guilty or not? [¶] If the evidence, whatever form it comes in, is sufficient to convince you beyond a reasonable doubt under these instructions that the defendant is guilty, the law says vote guilty. [¶] If the sum total of that evidence is not of the type and nature that convinces you beyond a reasonable doubt that the defendant is guilty, you vote not guilty."

As agreed, the court told the jury, "There is no legal requirement, as I have set forth, for a particular sort of thing, fingerprint evidence or eyewitness evidence, confession evidence or anything like that. [¶] If there was, I would tell you that. [¶] The issue is given all the evidence does that equal proof beyond a reasonable doubt in this case or not. You look at the totality of everything that was introduced by the prosecution and by the defense and you then answer that question."

The court's instructions continued as follows: "You are not prosecutors or defense attorneys. You are judges of the facts of this case. You must do your very best conscientiously and under the law or arrive at a verdict based on these instructions and the evidence. [¶] There is a requirement, and I stress it

again, that the defendant in this case or any criminal case be proven guilty beyond a reasonable doubt. In other words, the prosecution has the burden here of proving beyond a reasonable doubt that Mr. Alexander was involved in those events and is guilty under the law before a jury could return a verdict of guilt. [¶] However, that requirement need not be met by any particular type of evidence. [¶] The question is, again, I stress to you, given the totality of the evidence in the case, whatever it is, whether it is 100 eyewitnesses or no eyewitnesses, you look at all the evidence and you ask yourself does that evidence equal proof beyond a reasonable doubt under the instructions given by the court as a whole."

The court also stressed several times that the instructions applied to the jury as a whole, not any particular juror or group of jurors, and that the court was not encouraging any position on "whether the matter should be resolved and if so in what way." The jury deliberated for an additional three days before reaching its verdicts. The jury was polled after the verdict was announced, and each juror affirmed the verdict.

 Section 1089 provides that a trial court may dismiss a juror and replace him or her with an alternate if it finds the juror is unable to perform his or her duty. The court properly may dismiss a juror based on the juror's "unwillingness to engage in the deliberative process." (*People v. Cleveland* (2001) 25 Cal.4th 466, 485 [106 Cal.Rptr.2d 313, 21 P.3d 1225] (*Cleveland*).) A juror who expresses a fixed conclusion at the start of deliberations and rebuffs attempts to engage him or her in the discussion of other points of view raised by other jurors has refused to deliberate, and properly may be discharged. On the other hand, "[t]he circumstance that a juror does not deliberate well or relies upon faulty logic or analysis does not constitute a refusal to deliberate and is not a ground for discharge. Similarly, the circumstance that a juror disagrees with the majority of the jury as to what the evidence shows, or how the law should be applied to the facts, or the manner in which deliberations should be conducted does not constitute a refusal to deliberate and is not a ground for discharge." (*Ibid.*) A deliberating juror's refusal to follow the law set forth in the instructions also constitutes a failure to perform the juror's duties, and is grounds for discharge. (*People v. Engelman* (2002) 28 Cal.4th 436, 444 [121 Cal.Rptr.2d 862, 49 P.3d 209] (*Engelman*).)

 The trial court's authority to discharge a juror includes the authority to conduct an appropriate investigation concerning whether there is good cause to do so, and the authority to take "less drastic steps [than discharge] where appropriate to deter any misconduct or misunderstanding it has reason to suspect." (*People v. Keenan* (1988) 46 Cal.3d 478, 533 [250 Cal.Rptr. 550, 758 P.2d 1081] (*Keenan*).) As we have stated, "a trial court's inquiry into

possible grounds for discharge of a deliberating juror should be as limited in scope as possible, to avoid intruding unnecessarily upon the sanctity of the jury's deliberations. The inquiry should focus upon the conduct of the jurors, rather than upon the content of the deliberations. Additionally, the inquiry should cease once the court is satisfied that the juror at issue is participating in deliberations and has not expressed an intention to disregard the court's instructions or otherwise committed misconduct, and that no other proper ground for discharge exists." (*Cleveland, supra,* 25 Cal.4th at p. 485.) Nonetheless, the need to protect sanctity of the deliberations does not mean that any inquiry into the deliberation process violates the defendant's constitutional or statutory rights: "secrecy *may* give way to reasonable inquiry by the court when it receives an allegation that a deliberating juror has committed misconduct." (*Engelman, supra,* 28 Cal.4th at p. 443, citing *Cleveland, supra,* 25 Cal.4th at p. 476.) On appeal, we review for abuse of discretion the trial court's decisions concerning whether and how to investigate the possibility that a juror should be discharged for failure to perform his or her duties, and whether, ultimately, to discharge the juror or to take some other action. (*Engelman, supra,* 28 Cal.4th at p. 442.)

██ In the present case, the trial court reasonably viewed the foreman's note as indicating that one juror was refusing to deliberate, was refusing to follow the court's instructions on the law, or was doing some combination of both. Its choice to question the foreman about the circumstances did not needlessly invade the secrecy of the jury's deliberations. The court reasonably asked more detailed questions about what was occurring than simply whether the juror at issue was deliberating because it was concerned the juror may have been refusing to follow its instructions concerning circumstantial evidence. In light of the foreman's responses to its inquiry, the trial court was well within the bounds of reason in (1) suspecting the juror was failing to follow the court's instructions, and (2) determining that further instructions emphasizing that direct evidence is not legally required might help disabuse the juror of such a notion and obviate the need to discharge him. The court was mindful of its obligation not to do anything that might sway the juror, or any juror, from an honest view of the weight of the evidence, rather than settling a misunderstanding of the law. The court properly recognized that it was "imperative if the jury is going to hang, they will hang for the right reason which is an honest, good faith disagreement over whether the evidence rises to the level of proof beyond a reasonable doubt and not due to anything else." The trial court accordingly stressed to the jurors in its instructions that it was not directing the instructions at any one juror, and was not implying that any particular outcome, even reaching a verdict, was favorable or required.

██ Defendant unsuccessfully tries to portray the trial court's actions and instructions as a so-called *Allen* charge, in which jury instructions encourage a seemingly deadlocked jury to continue deliberations in order to try to reach

a verdict. (See *Allen v. United States* (1896) 164 U.S. 492 [41 L.Ed. 528, 17 S.Ct. 154]; *People v. Gainer* (1977) 19 Cal.3d 835, 852 [139 Cal.Rptr. 861, 566 P.2d 997] [holding, as a matter of judicially declared criminal procedure, that in response to a jury's indication that it is deadlocked, "it is error for a trial court to give an instruction which either (1) encourages jurors to consider the numerical division or preponderance of opinion of the jury in forming or reexamining their views on the issues before them; or (2) states or implies that if the jury fails to agree the case will necessarily be retried"].) Despite speculation that the jury might have been leaning 11 to one against the juror at issue, the foreman specifically stated that the jury had not yet voted on the charges. Moreover, according to the foreman, the whole jury still was discussing the evidence; indeed, at that time, it had been deliberating only for a few hours. The issue was not that the jury had discussed the evidence thoroughly and could not unanimously agree on a verdict, but rather it appeared that, from the outset of deliberations, the discussion and evaluation of the evidence was being short-circuited by one juror's apparent misunderstanding of, or refusal to follow, the law. The trial court's attempt to ensure the jurors understood the law cannot be viewed as an improper attempt to overcome a deadlock in the jury's deliberations. The court recognized there might ultimately be a hung jury, and, in fact, told the jury it had no position on "whether the matter should be resolved and if so in what way." Its instructions merely were an attempt to persuade the jurors to follow the law, which is not improper. (*Keenan, supra*, 46 Cal.3d at p. 536.)

In sum, the trial court did not abuse its discretion or violate any of defendant's statutory or constitutional rights in making its inquiry in response to the foreman's note or in deciding to give the supplemental instructions in an attempt to clarify the law for the jury.

### C. Challenged Penalty Phase Jury Instructions

Defendant contends the trial court erred by declining to instruct the jury at the penalty phase with a modified version of CALJIC No. 8.85 that would have informed the jury that mitigating factors need not be proved beyond a reasonable doubt, and that evidence of only one mitigating factor may be sufficient to support a decision that the appropriate punishment is life without the possibility of parole. We previously have rejected these contentions, and defendant presents no compelling reason for us to reconsider those decisions. (*People v. Guerra, supra*, 37 Cal.4th at p. 1150; see also *People v. Lucero* (2000) 23 Cal.4th 692, 729–731 [97 Cal.Rptr.2d 871, 3 P.3d 248] [CALJIC

No. 8.85 correctly describes the jury's role in evaluating penalty phase evidence, and the trial court is not obliged to give an instruction purporting to clarify that role].)

### D. *Alleged Interference with Jury Deliberations During Penalty Phase*

Defendant contends the trial court's response to a penalty phase note from the jury improperly invaded the jury's deliberations and coerced a verdict in violation of his statutory and constitutional rights. This claim is without merit.

On the afternoon of the second day of penalty phase deliberations, the jury sent the trial court a note asking "to take the balance of the day off to allow feelings to cool down" because it felt "this time off will be well spent. Tomorrow should be a much better day." The court excused the jury for the rest of the day. After lunch recess the next day, the jury sent the court another note that read, "We have a split eleven to one + the holdout will not listen to any reason. Please let us know how to continue. The holdout is based on the children." During a discussion of the second note with the parties, the court and the prosecutor expressed concern that the juror might be improperly considering sympathy for defendant's children as a mitigating factor, and/or might be basing a decision on sympathy evidence in isolation, rather than weighing it in conjunction with all the other evidence. (See *Ochoa, supra,* 19 Cal.4th at p. 456 [a capital jury cannot consider sympathy for a defendant's family in mitigation, but "family members may offer testimony of the impact of an execution on them if by so doing they illuminate some positive quality of the defendant's background or character"].) Over a defense objection, the trial court decided, without questioning the jurors, to give an instruction explaining the proper role of sympathy in the jury's deliberations. After incorporating two changes proposed by defense counsel, it gave the supplemental instruction set forth below in order to explain to the jury that, with regard to consideration of "sympathy," the focus of its inquiry at the penalty phase must be on defendant's character and background, "not the effect [its] verdict will or may have on any third party or parties."[41] As it had done in its

---

[41] The trial court instructed as follows: "By these instructions the court is not suggesting what result would be proper, or that I have or am expressing any opinion on the eventual penalty phase determination. [¶] The following provisions are, however, the law: [¶] It would be inappropriate for any juror, whether one favoring a sentence of death or one favoring a sentence of life without parole, to single out one piece of evidence or one instruction and ignore the others. This case must be decided—the case must be decided based on a totality of all the evidence and law that applies. [¶] It would be improper for any juror, whether favoring a sentence of death or a sentence of life without parole, to single out one aggravating or mitigating factor, and refuse or fail to weigh it against all of the other aggravating and mitigating factors shown by the evidence. [¶] The facts and the law are there to guide you to a

response to the jury's guilt phase note, discussed, *ante*, in part II.B.10., the trial court emphasized that it was not suggesting any particular result would be proper, and that the supplemental instruction was directed at all of the jurors, not those favoring one verdict or the other.

After receiving the supplemental instruction, the jury deliberated for approximately 25 minutes before adjourning for the weekend. Approximately 10 minutes after returning to deliberations on Monday, it announced that it had reached a verdict. As was the case in the guilt phase, the jury was polled after the verdict was announced, and each juror affirmed the verdict.

---

decision. The facts and the law are not there to justify any preformed or preexisting determination to stand for a certain verdict, whether it be for the death penalty or for a sentence of life without parole. [¶] In terms of the evidence relating to the defendant's family, such evidence was received as it may bear upon that portion of [Pen. Code, § 190.3,] factor (k) relating to 'any sympathetic or other aspect of the defendant's character or record.' Bear in mind that this 'sympathy' relates to sympathy for the defendant, not solely for any other person or persons. And bear in mind that the 'character' in issue is a character of the defendant. Insofar as this evidence evinces sympathy for the defendant or is seen as being evidence relating to the character or record of the defendant, the jury may consider it under factor (k), assign it whatever weight you believe is appropriate, and then weigh it along with all other aggravating and mitigating evidence and factors. Insofar as this evidence raises sympathy only for third parties, it is not appropriate factor (k) evidence. The focus, in other words, is on the defendant's personal moral culpability, and it is the defendant's character and background that is the focus of the inquiry, not the effect that your verdict will or may have on any third party or parties.

"Do not hesitate to change your position if you are convinced that it is wrong. Do not change your position simply because a majority of the jurors, or any of them, favor such a change. [¶] It is important that all jurors both understand as well as follow the law. If a juror or jurors do not understand the law, the court will continue to attempt to clarify it. If a juror or jurors refuses or fails to follow the law, the court should be notified of that fact. If any juror, whether they are in the majority or minority, cannot, in good conscience, follow the law, it is the duty of that juror or jurors to notify the court of that fact. [¶] Each juror should recognize a penalty phase determination is not an unguided arbitrary exercise in raw emotion whether the juror favors one penalty or the other. This decision must be based on a calm, rational assessment of the evidence and a weighing of aggravating and mitigating factors set forth in the law, and shown by the evidence. This requires that each juror render an honest, unbiased assessment of these factors without bias, without fear and without a desire to favor one side over the other. Jurors are not advocates for either side, but must be impartial judges of penalty.

"All of these additional instructions are directed at all twelve trial jurors, not those favoring one verdict or the other. Further, please keep in mind as I instructed you at the outset of these instructions, these latest instructions, that these instructions are not to be interpreted by the jury as suggesting an outcome, or as suggesting that the court is expressing an opinion as to the propriety of one outcome or the other. [¶] That's the instruction. [¶] Let me add to it the following: [¶] The court in no way, shape or form is suggesting to you the weight any juror or combination of jurors should place on any aggravating factor, any mitigating factor or any combination thereof. [¶] That is a jury determination, not a determination for the court. [¶] It is simply a hope that the instruction I read to you will assist you in following the law in this case and as I have outlined it in earlier instructions."

We conclude the trial court reasonably viewed the penalty phase note as indicating that a juror might not be following the law, and it took reasonable steps to remedy that potential problem. The court recognized the possibility that the juror at issue might have been improperly considering the effects that a sentence of death could have on defendant's children, and might have been basing a decision on the assessment of a single factor in isolation, rather than weighing the significance of that evidence against all other evidence. Pursuant to its authority to take steps less drastic than simply removing the juror for not following the law, the court properly first sought to clarify the applicable law to ensure that if the juror at issue, or any juror, decided a sentence of life without the possibility of parole sentence was appropriate, that decision would be legally proper. In response to defense counsel's objection that the proposed supplemental instruction was directed at the single juror, the court emphasized that the instruction was "not aimed at anybody. [¶] What it is aimed at is trying to determine [that if] a verdict is reached, . . . everybody [is] playing by the same rules." The court then reiterated that position in the instruction by explicitly advising the jurors that the court was not suggesting a particular outcome, but was directing the instruction to the entire jury in an attempt to clarify the law for its deliberations.

Notwithstanding defendant's parsing of the language of the supplemental instruction in an attempt to create ambiguity in its meaning, the trial court's supplemental admonition was a correct statement of law. The instruction considered in its totality properly stated the role of sympathy in the deliberations (see *People v. Bennett* (2009) 45 Cal.4th 577, 601 [88 Cal.Rptr.3d 131, 199 P.3d 535]), and it also properly stated the requirement that the jury weigh all the evidence in reaching the verdict, assigning whatever weight it deemed appropriate to each factor. Once again, the court also properly stressed that it was not indicating a position on how the case should be decided or how any piece of aggravating or mitigating evidence should be weighed in relation to the other evidence.

It is not improper for a trial court to attempt to ensure that jurors follow the law in order to avoid the need to remove a juror for failing to do so, and an instruction merely clarifying the law is not the equivalent of an *Allen* charge. The supplemental instruction here was such a proper attempt to clarify the law. The jurors could not reasonably have viewed it as encouraging any juror simply to give up a decision that was based on a proper application of the law to the facts of the case because other jurors had reached a different decision. In addition, in the context of the present case, the jurors could not have interpreted the legally correct admonition that they had a duty to notify the court if any juror was not following the law as an improper invitation for the majority of the jurors to "browbeat" a single juror into giving up what the court had just explained could be a *legally proper*

assessment of sympathy evidence and the balance of the mitigating and aggravating factors. (Cf. *Engelman, supra,* 28 Cal.4th at pp. 445–447 [an instruction at the *beginning* of deliberations that jurors should notify the court if a juror is refusing to follow the court's instructions carries needless potential danger of inducing the jurors to expose the contents of their deliberations in the event of a later disagreement].) Significantly, the supplemental instruction at the same time stated that the court would continue to attempt to clarify the law if a juror still was having difficulty understanding it. Contrary to defendant's arguments, the fact that the jury reached a unanimous verdict fairly soon (in terms of court time) after receiving the court's supplemental instruction does not necessarily reflect that the court's instructions had some improper influence on the verdict. Instead, the unanimous verdict, which was confirmed by polling the jury, could have resulted from the holdout juror's realizing that he or she had, in fact, been improperly considering sympathy solely for defendant's children, rather than how the children's testimony reflected on defendant's character, or basing his or her decision on the improper consideration of sympathy in isolation, rather than weighing the mitigating force of that evidence in the context of all of the aggravating and mitigating evidence. In other words, the change in the juror's position very well could have been the result of enlightenment, not coercion.

Defendant appears simultaneously to fault the trial court for considering "mental process information" contained in the note, and for assuming the meaning of the note without inquiring of the jurors. At oral argument, defendant primarily asserted that the trial court should not have addressed its instruction to the issue mentioned in the note because doing so invaded the secrecy of the jury's deliberations. The court, however, could not ignore what was contained in the note (see *Engelman, supra,* 28 Cal.4th at p. 443 [a claim of juror misconduct may require judicial action "even though [the claim] may implicate the content of deliberations"]), and the court's decision to interpret its meaning and address what it saw as a likely potential problem expressed therein was reasonable. Nor was it an abuse of discretion for the court to do so without asking the jurors any questions: the deliberations obviously were at a crucial point and had become so contentious that the jury felt compelled to cut deliberations short on the previous day. The trial court reasonably could have believed that inquiring of the jury regarding the note could have led to statements that might further exacerbate the conflict or give an inaccurate impression of what was occurring. Defendant does not suggest how the court could have explored the issue with the jurors in a way that would have illuminated the difficulty without making matters worse. In fact, defense counsel objected to any inquiry when he stated, "my general feeling is that if the court has given a correct instruction, we're not supposed to invade why a juror is making a decision based upon evidence that the court allowed to be heard in the penalty phase of the trial." The court's cautious

approach in this sensitive situation was not beyond the bounds of reason. (*Cleveland, supra,* 25 Cal.4th at p. 480.)

In sum, the trial court's supplemental instruction was a reasonable response to a reasonable determination of the implications of the jury's note, and therefore did not constitute an abuse of discretion or a violation of defendant's rights.

### E. *Denial of New Trial Motion*

Defendant contends the trial court abused its discretion by denying his motion for a continuance to file a new trial motion, and it thereby denied him his federal rights to due process and effective assistance of counsel. Defendant also contends the court erred by "deeming" that he had made a new trial motion, and proceeding to deny that motion. We are not persuaded.

The jury reached its penalty verdict on March 18, 1996.[42] Defendant's attorney suggested the hearing on a motion for a new trial and other pending defense motions be held on April 15, 16, or 17. Because Detective Henry was unavailable on the dates suggested by defense counsel, the trial court set the hearing for April 23 at the prosecutor's request. On March 22, four days after the verdict, defendant filed a motion for release of the jurors' identifying information, asserting his counsel wished to interview the jurors to determine whether any juror misconduct occurred that could be raised in the new trial motion. On April 11, the trial court denied the motion, finding that defendant had not shown good cause for disclosure.

The next day, defendant moved for a continuance of the hearing on the new trial motion because defense counsel would not be prepared to file the motion due to counsel's health and time spent working on another matter, and because counsel would need more time to conduct juror interviews if the court reconsidered and granted the motion to release juror information. The court held a hearing on the continuance motion on April 16, during which defense counsel said he would not be prepared because he was cocounsel in a habeas corpus case that had an evidentiary hearing scheduled for April 22, and he had been working exclusively and extensively on that case since March 29. The court expressed concern that defendant's case, which at that point had been pending for several years, should proceed without further unwarranted delay. It also noted that the date for the new trial motion had been set later than defendant had requested, and that several months before, defense counsel had indicated that the habeas corpus case would not interfere with his ability to prepare for defendant's case. In denying the motion for the

---

[42] All calendar dates in part II.E. of this opinion refer to 1996.

continuance, the court found that five weeks was sufficient time to prepare the motion for a new trial and that counsel's calendaring conflicts were not sufficient cause for a continuance.[43]

At the April 23 hearing, defense counsel again raised the issue of his inability to prepare the motion for a new trial, claiming his failure to file the motion may have resulted in defendant receiving "incompetent assistance." The trial court reiterated its reasons for denying the continuance, and described counsel's claim of incompetence as an attempt to "blackmail" it into granting the continuance. The trial court later noted that defense counsel had not filed a motion for a new trial, and stated that the court would "deem" the defense to have made such a motion based on all of defendant's trial objections, the court's exclusion of defense evidence, the motion for mistrial, the objections to the jury instructions, the court's decision to allow impeachment of defendant with the triple murder conviction if he testified, the use of the triple murder in the special circumstance phase despite defendant's claim that his attorney in that case had been constitutionally deficient, and the court's denial of defendant's motions to dismiss the case based on improper wiretap procedures and the removal of Attorney Kopple from the case. The trial court then stated it was denying "your motion," but it invited the defense to add any other grounds. When defendant raised a claim that defense counsel was ineffective for having failed to pursue a writ of mandate concerning the denial of defendant's motion to recuse the trial judge, the trial court denied the new trial motion on that ground as well.

Under section 1050, subdivision (e), "[a] 'trial court has broad discretion to determine whether good cause exists to grant a continuance of the trial. [Citation.] A showing of good cause requires a demonstration that counsel and the defendant have prepared for trial with due diligence.' [Citation.] Such discretion 'may not be exercised so as to deprive the defendant or his attorney of a reasonable opportunity to prepare.' [Citation.] 'To effectuate the constitutional rights to counsel and to due process of law, an accused must . . . have a reasonable opportunity to prepare a defense and respond to the charges.' [Citation.]" (*People v. Roldan* (2005) 35 Cal.4th 646, 670 [27 Cal.Rptr.3d 360, 110 P.3d 289].) "[B]road discretion must be granted trial courts on matters of continuances; only an unreasoning and arbitrary 'insistence upon expeditiousness in the face of a justifiable request for delay' violates the right to the assistance of counsel." (*Morris v. Slappy* (1983)

---

[43] At the hearing, the trial court also denied defendant's personal request for a 30-day continuance for him to file in propria persona a new trial motion. On April 23, defendant did file his own new trial motion, raising several claims of ineffective assistance of counsel. The trial court entertained and denied that motion. We shall assume the filing of defendant's "pro per" motion for a new trial did not render moot the issue whether the trial court improperly denied defendant a reasonable opportunity to have his attorney file such a motion on his behalf.

461 U.S. 1, 11–12 [75 L.Ed.2d 610, 103 S.Ct. 1610] (*Slappy*); see also *People v. Jenkins* (2000) 22 Cal.4th 900, 1039–1040 [95 Cal.Rptr.2d 377, 997 P.2d 1044] (*Jenkins*).)

The trial court did not abuse its broad discretion by denying the continuance in this case. Defendant was provided with a reasonable period of time in which to file the new trial motion, longer than he originally had requested. This case is distinguishable from *People v. Sarazzawski* (1945) 27 Cal.2d 7 [161 P.2d 934], on which defendant relies. In that case, despite the trial court's having required that the motion for new trial be filed only three days after the verdict, defense counsel did file the motion. We concluded, however, that the trial court had denied the defendant his right to a fair and reasonable opportunity to be heard by misleading defense counsel in stating that argument on the motion would take place 10 days after the motion was filed, but then requiring counsel to argue the motion at the initial hearing, and denying her request for a continuance. (*Sarazzawski, supra*, 27 Cal.2d at pp. 16–18.) Here, the trial court did not mislead defendant about the date the motion would be heard, and it provided a much longer period of time to prepare. In addition, defense counsel's purported focus on the unrelated habeas corpus proceeding did not begin until more than 10 days after the verdict in defendant's case. Although counsel knew one week before the April 23 hearing that the court had refused a continuance, he filed no motion. Nor did the filing and ultimate denial of the motion for disclosure of the juror information prevent counsel from completing other aspects of the new trial motion, as defendant seems to argue on appeal. Even if defendant had asked the court to reconsider the denial of this motion, which he did not, counsel could have filed a new trial motion addressing other potential claims before the deadline to ensure consideration of at least those claims. The trial court's decision to deny the continuance under these circumstances did not deny defendant a "fair and reasonable opportunity" to be heard. The decision was within the bounds of reason given the defense's apparent lack of diligence as weighed against the length of time the case had been pending and the court's concern that it not continue to drag on.

Having concluded the trial court did not abuse its discretion by denying a continuance, we reject defendant's claims that the ruling violated his federal constitutional rights. Assuming without deciding that his counsel's comment that denial of the motion may have resulted in defendant's receiving "incompetent representation" preserved defendant's claims, they fail because the trial

court acted reasonably and within its broad discretion in denying the continuance. (*Jenkins, supra,* 22 Cal.4th at pp. 1039–1040; *Slappy, supra,* 461 U.S. at pp. 11–12.)[44]

We turn to defendant's separate challenge to the trial court's decision to "deem" that a new trial motion had been made and to deny such motion. Even assuming the court's decision was equivalent to its acting ultra vires by making its own new trial motion, contrary to the statute (see § 1181; *People v. Rothrock* (1936) 8 Cal.2d 21, 24 [63 P.2d 807]), and that defendant did not forfeit or waive this contention by failing to object below and by adding his own ground for granting the motion, the trial court's actions could not have prejudiced defendant. Defense counsel did not file a motion for a new trial on defendant's behalf, and, as discussed above, the trial court's decision not to grant the continuance counsel requested for that purpose was not an abuse of discretion and did not violate defendant's rights. The trial court did not "replace" defendant's motion for a new trial with one of its own, as defendant asserts. The trial court's purporting to deny a motion that may not have been properly before it did not adversely affect the fairness of defendant's trial; at most, the trial court's action could be viewed as a legal nullity.

F. *Alleged Error During Section 190.4, Subdivision (e) Hearing*

At the hearing at which it imposed sentence, the trial court considered the automatic application for modification of the verdict. (§ 190.4, subd. (e).) Defendant contends the court erred by reviewing his probation report prior to hearing argument and ruling on the application because the report contained potentially aggravating information not presented to the jury, some of which was erroneous.[45]

 "In ruling on an application for modification of the verdict, the trial court may only rely on evidence that was before the jury. [Citation.] Therefore, the better procedure is to rule on the application for modification before reading the probation report. [Citation.]" (*People v. Navarette* (2003) 30 Cal.4th 458, 526 [133 Cal.Rptr.2d 89, 66 P.3d 1182] (*Navarette*).) We will not find error, however, when the trial court reads the probation report in preparation for sentencing that is to occur on the same day as the ruling on the motion if nothing in the record suggests the court considered or relied on the probation report when ruling on the motion. (*Ibid.*)

---

[44] The question whether or not defendant's attorney provided constitutionally deficient assistance by failing to file the motion in a timely manner is not before us.

[45] We assume, without deciding, that defense counsel's statements regarding the trial court's consideration of the probation report, made before the court actually stated what it considered when ruling on the motion, are sufficient to preserve this issue for review although counsel did not object after the court listed what it actually had considered and explained the reasons for its decision.

Although the trial court's early statements at the hearing might give the impression that it had read and considered the probation report in evaluating the motion for modification of the verdict—perhaps because counsel on both sides repeatedly interrupted the court before it could explain what it meant—the court later, in both its oral statement of reasons and its written order that had been prepared before the hearing, clarified exactly what material it had considered. Nothing in the court's oral or written statements of reasons indicated that it considered any information in the probation report, which notably is absent from the actual list of items and evidence the court stated it did consider. The general references to "the record" and "the entire record" in the court's statements regarding its search for any mitigating circumstances that had not been argued to the jury do not suggest the court had considered the probation report, much less that it considered the potentially *aggravating* parts of the report of which defendant complains. In its discussion of how the particular aspects of the case fit within the mitigating and aggravating factors set forth in section 190.3, the trial court did not mention any fact contained in the probation report that was not in the evidence presented at trial. In fact, the trial court recognized that the parties "may be qui[te] correct that the matters set forth in the probation report should not be considered vis-à-vis a modification of the sentence."

We are not persuaded by defendant's claim that because the trial court later in the proceeding struck erroneous information from the probation report, it must have considered erroneous aggravating information in the report when ruling on the application for modification. Instead, we find that this shows the trial court properly compartmentalized the various aspects of the proceedings by ruling on the application to modify the verdict based on the evidence that had been presented at trial and then addressing the accuracy of the probation report and imposing the sentence. Finding no suggestion in the record that the trial court actually considered the probation report when it ruled on the application to modify the verdict, we conclude it did not err. (*Navarette, supra,* 30 Cal.4th at p. 526.)

Defendant also contends the trial court abused its discretion because it denied his request for a continuance to file the new trial motion, in which he also asked for continuances of the section 190.4 and sentencing hearings. We already have concluded, *ante,* in part II.E., that the trial court did not abuse its discretion regarding the continuance for the new trial motion. The claim is even less compelling here, given that defense counsel never indicated he was unable to prepare for the automatic motion for modification of the verdict or sentencing.

### G. *Constitutionality of California's Death Penalty Law*

Defendant reiterates various constitutional challenges to California's death penalty law, including challenges to the standard penalty phase jury instructions that we have rejected repeatedly. As we concluded in *Rundle, supra,* 43 Cal.4th at pages 198–199, and cases cited therein, we reiterate that the death penalty statutes adequately narrow the class of murderers eligible for the death penalty, are not impermissibly vague or overbroad, and do not result in an "arbitrary and capricious" or "wanton and freakish" penalty determination. Those cases also have held that the statutes do not require that the prosecution carry the burden of proof or persuasion at the penalty phase, that the jury make written findings or reach unanimous decisions regarding aggravating factors, or that the jury find beyond a reasonable doubt that (1) the aggravating factors have been proved, (2) the aggravating factors outweigh the mitigating factors, or (3) death is the appropriate sentence. *Apprendi v. New Jersey* (2000) 530 U.S. 466 [147 L.Ed.2d 435, 120 S.Ct. 2348] and *Ring v. Arizona* (2002) 536 U.S. 584 [153 L.Ed.2d 556, 122 S.Ct. 2428] do not render the statutes invalid; neither does *Cunningham v. California* (2007) 549 U.S. 270 [166 L.Ed.2d 856, 127 S.Ct. 856]. (*People v. Romero* (2008) 44 Cal.4th 386, 429 [79 Cal.Rptr.3d 334, 187 P.3d 56].) There is no violation of the equal protection of the laws as a result of the statutes' asserted failure to provide for capital defendants some procedural guarantees afforded to non-capital defendants.

The use in the statutes, and in the standard jury instructions, of terms such as "extreme," "substantial," "reasonably believed," and "at the time of the offense" in setting forth the mitigating factors does not impermissibly limit the mitigation evidence or otherwise result in an arbitrary or capricious penalty determination. The statutes, as translated into those standard jury instructions, adequately and properly describe the process by which the jury is to reach its penalty determination. There is no need to instruct the jury at the penalty phase (1) regarding a burden of proof, except as to section 190.3, factors (b) and (c), or the absence of a burden of proof, (2) regarding the meaning of the term "mitigation," (3) that mitigating factors can be considered only in mitigation, (4) that if the mitigating evidence outweighs the aggravating evidence, the jury must impose a sentence of life without the possibility of parole, or (5) that the jury is not required to impose the death penalty even if it finds the aggravating evidence outweighs the mitigating evidence. The trial court need not omit from the instructions any mitigating factors that appear not to apply to the defendant's case.

There is no requirement that the trial court or this court engage in intercase proportionality review when examining a death verdict. A sentence of death

that comports with state and federal statutory and constitutional law does not violate international law or norms, or the Eighth Amendment to the United States Constitution.

### H. *Cumulative Error*

Defendant contends the cumulative effect of the claimed guilt and penalty phase errors requires reversal of his conviction and death sentence even if no error is prejudicial individually. The only error we have found is the admission of Detective Henry's testimony about the November 1, 1992 telephone call he received from April Watson; see, *ante*, part II.B.4. That error was harmless. Similarly, in those circumstances in which we have assumed error, we have concluded defendant could not have been prejudiced. We are not persuaded that, even if considered cumulatively, such errors could have denied defendant a fair trial.

### III. CONCLUSION

We affirm the judgment.

George, C. J., Kennard, J., Baxter, J., Werdegar, J., Moreno, J., and Corrigan, J., concurred.

Appellant's petition for a rehearing was denied September 29, 2010, and the opinion was modified to read as printed above.